**FRIENDS OF ENDANGERED SPECIES, INC., Plaintiff-Appellant,**

v.

**Robert A. JANTZEN, Director, United States Fish and Wildlife Service; County of San Mateo; City of Daly City; City of Brisbane; City of South San Francisco; Visitacion Associates; W.W. Dean and Associates, Inc.; Presley of Northern California, Inc.; Foxhall Investment, Ltd., Defendants-Appellees.**

No. 84–1991.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 15, 1985.

Decided May 14, 1985.

Michael Freund, Berkeley, Cal., for plaintiff-appellant.

David Byers, Redwood, Cal., for defendants-appellees.

Before PREGERSON and FERGUSON, Circuit Judges, and CURTIS,* Senior District Judge.

PREGERSON, Circuit Judge:

Friends of Endangered Species, Inc. (Friends) appeals from a summary judgment in favor of public and private appellees.[1] Friends had challenged a decision of the United States Fish and Wildlife Service (the Service) to issue a permit that authorized the "taking"[2] of Mission Blue butterflies from areas of the San Bruno Mountain. For the reasons stated below, we affirm the district court's order, 589 F.Supp. 113, granting summary judgment to appellees.

FACTS

San Bruno Mountain (the Mountain), an area rich in wildlife, contains about 3,400 acres of undeveloped land located on the northern San Francisco Peninsula. Throughout the early 1970's, appellees Visitacion Associates and the Crocker Land Company, a co-owner of Visitacion, purchased virtually all the land on the Mountain. In 1975, they proposed to develop approximately 7,655 residential units and

2,000,000 square feet of office and commercial space on the Mountain.

Appellee's proposal generated intense controversy over the appropriate level of development of the Mountain. A local environmental group, the Committee to Save San Bruno Mountain, led the opposition to Visitacion Associates' development proposal. In response to this controversy, in March 1976, the San Mateo County Board of Supervisors (the County) adopted the San Bruno Mountain General Plan Amendment (the General Plan Amendment), which permitted construction of only 2,235 residential units, as well as some office and commercial space. The General Plan Amendment designated the remainder of the land on the Mountain as open space.

In 1980, litigation between Visitacion Associates and the County over the General Plan Amendment was settled. Under the settlement, Visitacion Associates and the Crocker Land Company sold or donated to the County and the State of California over 2,000 acres of the Mountain for parkland. The County and Visitacion Associates also agreed to designate about one-third of the Mountain for development and two-thirds for parks.

Shortly after the settlement was reached, the Service found that the Mission Blue butterfly, which was on the endangered species list, inhabited the Mountain.[3]

In May 1980, various individuals and entities formed the San Bruno Mountain Steering Committee (the Committee) to formulate a plan that would both protect the endangered species and allow some development of the Mountain. The Committee consisted of representatives of the County, the cities of Brisbane, Daly City, and South

---

* The Honorable Jesse W. Curtis, Senior United States District Judge, Central District of California, sitting by designation.

1. The appellees are Robert A. Jantzen, Director, United States Fish and Wildlife Service; the County of San Mateo; Daly City; the City of Brisbane; the City of South San Francisco; Visitacion Associates; W.W. Dean and Associates, Inc.; Presley of Northern California, Inc.; and Foxhall Investment, Ltd.

2. The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, ... or to attempt to engage in any such conduct. 16 U.S.C. § 1532(19) (1982).

3. Two other endangered species, the San Bruno Elfin butterfly and the San Francisco Garter Snake, also habitate the Mountain, but are not found in significant numbers in the areas to be developed.

San Francisco (the Cities), Visitacion Associates, other prospective developers, landowners, the Service, the California Department of Fish and Game, and the Committee to Save San Bruno Mountain (the citizens' group which had opposed Visitacion Associates' 1975 development proposal).

The Steering Committee initiated a two-year Biological Study of, among other species, the Mission Blue butterfly, to determine its population and distribution on the Mountain and whether development would conflict with the butterflies' continued existence. The study technique employed was a mark-release-recapture of the butterflies.[4]

The Biological Study concluded that the Mission Blue inhabited most of the grassland portions of the Mountain, including areas planned for development. The Study also determined that if development did not occur, the butterflies' grassland habitat would inevitably be lost to encroaching brush, and the butterflies' continued existence would be seriously threatened.

In October 1981, the Steering Committee began developing a Habitat Conservation Plan (the Plan), based on the Biological Study. The Plan was to provide an approach by which habitat protection and real estate development on the Mountain would take place at the same time. The Steering Committee incorporated the final Plan into an implementing document, called the "Agreement with Respect to the San Bruno Mountain Area Habitat Conservation Plan" (the Agreement). The County, the Cities, the major landowners and developers, the California Department of Fish and Game, and the California Department of Parks and Recreation executed the implementing agreement.

The Agreement dedicated 793 privately owned acres to local agencies as permanent open space, preserved 81% of the open space on the Mountain as undisturbed habitat with another 3% of open space to be restored after temporary disturbances during construction. The Agreement also required lot owners on the Mountain to contribute $60,000 annually to finance a permanent habitat conservation program. The County agreed to supervise the program. According to the Plan, the development would disturb only 14% of the present habitat of the Mountain's population of Mission Blue butterflies.

To effectuate the Agreement, section 10(a) of the Endangered Species Act (ESA), 16 U.S.C. § 1539 (1982), required the Service to issue a Permit. Because the Service's approval of the Permit required compliance with federal and California environmental statutes, San Mateo County and the Service agreed in February 1982, to prepare jointly a combined Environmental Impact Report (EIR), required under state law, and an Environmental Assessment (EA), required under federal law. In July 1982, the Service published notice of the draft EIR/EA on the Plan and proposed Permit and made the EIR/EA public for hearing and comment. The Service received both favorable and adverse comments and, in its Permit Findings and final EIR/EA, considered and responded to these comments.

In November 1982, the Service received a formal application for a Permit from the County and the Cities for the incidental taking of Mission Blue butterflies, San Bruno Elfin butterflies, and San Francisco garter snakes. The Service then published notice of its receipt of the Permit application and requested public comments.

In March 1983, the Service issued a Biological Opinion concluding that, pursuant to section 7(a)(2) of the Endangered Species Act (ESA), 16 U.S.C. § 1536 (1982), the planned development under the Permit would not jeopardize the continued exist-

---

**4.** This standard technique for studying population structure of butterflies entails capturing individual butterflies and giving each a unique wing identification mark. The butterfly then is released where captured. When a butterfly is recaptured, its identity and characteristics are re-recorded. By observing the proportion of marked animals to unmarked animals in subsequent capture periods, experts infer the population size and distribution of the butterfly in the study area.

ence of various species on the Mountain, including the Mission Blue butterfly. The Service also issued a Finding of No Significant Impact (FONSI) stating that issuance of the Permit would not significantly affect the quality of the human environment. This finding obviated the need for an Environmental Impact Statement. *See* 42 U.S.C. § 4332(2)(C) (1982); *Preservation Coalition v. Pierce*, 667 F.2d 851, 855 (9th Cir.1982).

Also in March, the Service issued the Permit, conditioned upon implementation of the Agreement and the Plan. The Permit allows incidental "taking" of the Mission Blue on the Mountain, but prohibits taking of the San Francisco Garter Snake and the San Bruno Elfin butterfly within their designated habitats, unless the Service grants an amendment to the Permit.

In August 1983, Friends filed an action in the district court for declaratory and injunctive relief. Friends contended that because the field studies were methodologically flawed, the Service's findings that relied on the field data were arbitrary and capricious, and that approval of the Permit based on such findings constituted an abuse of the agency's discretion. Friends also alleged that the EIR/EA's discussion of environmental impacts and alternatives to development on the Mountain was insufficient under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 (1982), to enable the Service adequately to assess the environmental impacts of the Permit and the Plan. Friends alleged that NEPA, therefore, required the Service to prepare a full-blown Environmental Impact Statement in this case.

In November 1983, Friends moved the district court for both a temporary restraining order and a preliminary injunction to halt certain grading work on the Mountain. The district court denied both motions. Appellees then brought a motion for summary judgment, which the district court granted. The district court held that appellant had failed to raise an issue of material fact on any of its claims under NEPA or the ESA. Friends now appeals this ruling.

The issues presented on appeal are: (1) whether appellant raised a genuine issue of material fact in alleging that the Service violated the ESA in issuing the Permit allowing incidental "taking of" various species including the Mission Blue butterfly from San Bruno Mountain; (2) whether appellant raised a genuine issue of material fact in alleging that the service failed to comply with NEPA.

## STANDARD OF REVIEW ON SUMMARY JUDGMENT

■ In reviewing a grant of summary judgment, we must determine whether, after viewing the evidence in the light most favorable to the opposing party, any genuine issue of material fact remains for trial and whether the substantive law was correctly applied. Fed.R.Civ.P. 56(c); *Amaro v. Continental Can Co.*, 724 F.2d 747, 749 (9th Cir.1984). We review *de novo* the trial court's grant of summary judgment. *Lojek v. Thomas*, 716 F.2d 675, 677 (9th Cir. 1983).

## DISCUSSION

I. *Violation of the Endangered Species Act*

Appellant first contends that in issuing the Permit, the Service failed to comply with sections 10(a) and 7(a)(2) of the ESA. As the following discussion demonstrates, Appellant's contention is erroneous.

A. *Standard of Review—Administrative Decisions Under the ESA*

■ Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1982), governs review of the Service's actions concerning the ESA. *Village of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir.1984) (citing *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 685 (D.C.Cir. 1982) ).

■ Under the APA, the appropriate standard of review for administrative decisions involving the ESA is the "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law" standard. 5 U.S.C. § 706(2)(A).[5] *See also Village of False Pass,* 733 F.2d at 609–610. Under this standard, administrative action is upheld if the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 2257, 76 L.Ed.2d 437 (1983) (citation omitted). We review the district court's granting of summary judgment *de novo.* And in doing so, we need to determine whether appellant raised a genuine issue of material fact as to whether the Service acted arbitrarily and capriciously in issuing the Permit under the ESA.

B. *The Service complied with section 10(a) of the Endangered Species Act.*

■ Section 10(a) of the ESA allows the Service to permit an applicant to engage in an otherwise prohibited "taking" of an endangered species under certain circumstances. The applicant first must submit a comprehensive conservation plan. The Service then must scrutinize the plan and find, after affording opportunity for public comment, that: (1) the proposed taking of an endangered species will be "incidental" to an otherwise lawful activity; (2) the permit applicant will minimize and mitigate the impacts of the taking "to the maximum extent practicable"; (3) the applicant has insured adequate funding for its conservation plan; and (4) the taking will not appreciably reduce the likelihood of the survival of the species. Appellant challenges the

sufficiency of the Permit findings relating to the second and fourth of these section 10(a) requirements.

1. *The field study adequately supported the Service's findings that "the taking will not appreciably reduce the likelihood of the survival of the species."*

The Service went beyond the statutory requirement and concluded that the Permit, coupled with the Plan, was likely to *enhance* the survival of the Mission Blue butterfly.[6]

Appellant contends that the Service's determination that issuing the permit would not reduce the likelihood of the Mission Blue butterfly's survival was arbitrary and capricious because of alleged scientific shortcomings in the Biological Study upon which the decision was based. Specifically, appellant argues that low recapture rates and allegedly mistaken recaptures by the field crew in the mark-release-recapture phase of the field study invalidated the Study's conclusions, and that the Service abused its discretion in relying upon such data to approve the Permit. With respect to this contention, appellant fails to raise a genuine issue of material fact.

As the district court determined, the legislative history to section 10(a)'s 1982 amendments suggests that Congress viewed appellees' conduct in the present case as the paradigm approach to compliance with section 10(a):

*In some cases, the overall effect of a project can be beneficial to a species, even though some incidental taking may occur. An example is the development of some 3000 dwelling units on*

---

5. Although the APA contains a *de novo* review provision, this provision only pertains in two limited instances, neither of which is found in the present case. First, *de novo* review is authorized when the action is adjudicatory in nature and the agency's factfinding procedures are inadequate. Second, there may be independent judicial factfinding when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action. *See Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears,* 685 F.2d at 685–86.

6. The Service concluded that the plan would enhance the butterflies' survival because it would result in the conveyance of a substantial amount of critical habitat to public ownership as well as establish a permanent program to protect the grassland habitat, eliminate gorse and some eucalyptus that encroach on the habitat in the San Bruno Mountain Area, regulate recreation and development activities, and insure uniform management of conserved habitat within the area. Gorse is any evergreen shrub or tree of the genus Juniperus.

*the San Bruno Mountain near San Francisco.* This site is also habitat for three endangered butterflies.... *Absent the development of this project these butterfly recovery actions may well have never been developed.* The proposed amendment should lead to resolution of potential conflicts between endangered species and the actions of private developers, while at the same time encouraging these developers to become more actively involved in the conservation of these species.

Senate Rep. No. 97–418, 97th Cong., 2d Sess. 10 (1982) (emphasis added). The House Conference Report indicates, in stronger terms than the Senate Report, that the Service acted properly in relying upon the Biological Study to comply with section 10(a):

> Because the San Bruno Mountain plan is the model for this long term permit and because the adequacy of similar conservation plans should be measured against the San Bruno plan, the Committee believes that the elements of this plan should be clearly understood....
>
> Prior to developing the conservation plan, the County of San Mateo conducted an independent exhaustive biological study which determined the location of the butterflies.... The biological study was conducted over a two year period and at one point involved 50 field personnel.
>
> The San Bruno Mountain Conservation Plan is based on this extensive biological study.

H.R.Rep. 97–835, 97th Cong., 2d Sess. 31–32 (1982), U.S.Code Cong. & Admin.News 1982, p. 2807, 2872.

■ In addition, appellant failed to bring many of these purported field data "errors" and "inconsistencies" to the attention of the Service until after the district court denied appellant's motion for summary judgment.[7] Clearly, the Service did not act arbitrarily in failing to consider criticisms not presented to it before issuing the Permit. Review of the reasonableness of an agency's consideration of environmental factors is "limited ... by the time at which the decision was made." *City and County of San Francisco v. United States,* 615 F.2d 498, 502 (9th Cir.1980) (citations omitted).

The Service did, however, extensively solicit and consider expert and public comments on the Biological Study before issuing the Permit. And, the Biological Study itself acknowledged methodological limitations.[8]

Thus, there is no evidence that the Service issued the Permit either in ignorance or deliberate disregard of the Biological Study's limitations. Moreover, the Service responded in good faith in its Permit Findings to the criticisms which it sought out and received concerning the Biological Study, and acted reasonably in relying upon the Biological Study to conclude that the Plan would not reduce the likelihood of survival of the Mission Blue butterfly. Again, the Service cannot be said to have acted arbitrarily by not responding to criticisms not received when it approved the Permit.

■ We also consider it relevant that the Permit was expressly made subject to revocation and reconsideration based upon data that might be revealed from the continuing monitoring called for under the Plan. *See Village of False Pass,* 733 F.2d at 611. Thus, the Service complied with section 10(a)'s mandate by determining that "the incidental taking" of the Mission Blue would enhance the survival of the species. In light of the clear declaration of legislative intent and the Service's efforts to con-

---

7. Appellant contends that it did not have access to the field data until late in 1983. Appellees dispute this and the record provides no corroborating support for appellant's contention.

8. The Biological Study acknowledged that population estimates had a "high variance" where the recapture rate fell below 50%, but stressed that, while extrapolation to "predict the actual total population is subject to high uncertainty (variance), a comparison of the census ... between similar areas provides a sense of the overall population."

sider all criticisms of the Biological Study before relying upon it, we hold that the district court was correct in concluding that there were no genuine issues of material fact that would preclude it from determining that the Service did not act arbitrarily or capriciously in relying on the Biological Study.

> 2. *The Service did not act arbitrarily or capriciously in concluding that the Plan complied with section 10(a)'s requirement to minimize and mitigate the impact of the taking upon endangered species.*

The Plan at issue contains various measures to "minimize and mitigate" the impact of the project upon the Mission Blue butterfly. The Plan and the Agreement provide for the permanent protection of 86% of the Mission Blue's habitat. Moreover, funding for the Plan would yield $60,000 annually, which would be used to halt the apparent incursion of brush and gorse into the habitat and permit the re-establishment of grasslands for the butterfly.

In addition to provisions to halt advancing brush and gorse, the Plan contains continuing and comprehensive restrictions on land development and significant financial incentives.[9] Regardless of whether brush and gorse continue to spread, these additional mitigating measures should play a significant role in enhancing the protection of endangered species on the Mountain.

▇ Appellant also contends that the Saddle Area of the Mountain, now publicly owned for parkland and consisting of 75% brush, should be substituted for one of the grassland parcels currently proposed for development. Appellant suggests that this Saddle Area alternative would more effectively mitigate the Plan's effects. The EIR/EA authors considered and rejected this Saddle Area development alternative. They concluded, among other things, that development of the Saddle Area would have secondary impacts including a biological impact greater than that produced by the Saddle's proposed use as a county park. The Saddle Area allegedly contains unique wetlands and endangered plants, and its development could meet with stiff environmental opposition.[10]

Thus, the district court correctly concluded that there is simply no genuine factual dispute as to whether the Service acted arbitrarily or unreasonably in determining that the Plan complied with section 10(a)'s mitigation requirement.

> 3. *Appellant does not raise a genuine issue of material fact in alleging that the Service failed to comply with section 7(a)(2) of the ESA.*

Section 7(a)(2) of the ESA states:

Each Federal agency shall ... insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical.... In fulfilling [these] requirement[s] ... each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2). An action would "jeopardize" a species if it "reasonably would be expected to reduce the reproduction, numbers, or distribution of a listed species to such an extent as to appreciably reduce the likelihood of the survival and recovery of that species in the wild." 50 C.F.R. § 402.02 (1984).

Pursuant to section 7(a)(2), the Service determined that the Permit would not like-

---

9. For example, the permanent trust fund with funding of $60,000 annually would ensure substantial sums for habitat conservation and enhancement.

10. Appellant also contends that the Biological Study's deficiencies made it inadequate to sup-

port the Service's findings that the proposed development would mitigate detrimental impacts to the Mission Blue. As our earlier discussion indicates, the Service did not act arbitrarily or capriciously in relying upon the Biological Study to reach its determinations.

ly jeopardize the continued existence of the Mission Blue butterfly. In so determining, the Service relied upon a variety of information including the Biological Study, the Plan, the Agreement, the EIR/EA, public comments received on the Permit Application, peer reviews of the Biological Study, and file materials on the Mission Blue butterfly.

Appellant erroneously contends that these sources did not represent the best scientific data available because of "the uncontroverted evidence from [the two experts upon whom it relies] revealing major mistakes in the field study."

■ Again, the low recapture rate realized in the mark-release-recapture phase of the Biological Study was a limitation that the Study itself and the Service acknowledged. And, several peer reviews took note of the limitations inherent in low mark-release-recapture rates. Thus, the Service was aware of all relevant limitations on the Biological Study and the field data, and the Service addressed those limitations in its Permit Findings. During the administrative process, appellant and its two experts did not direct the Service to any better available data. Moreover, the Service considered whatever data and other materials appellants provided. "[T]he issue for review is whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Stop H–3 Ass'n v. Dole*, 740 F.2d 1442, 1459 (9th Cir.1984). There is no genuine issue of material fact to dispute the district court's determination that the Service did not act unreasonably or capriciously, or in violation of section 7(a)(2), by considering all the data it received in the present case.

## II. *Violation of the National Environmental Policy Act*

■ The purpose of NEPA is to assure that federal agencies are fully aware of the impact of their decisions on the environment. *Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585 (9th Cir.1981). Thus, section 102(2) of NEPA,

42 U.S.C. § 4332(2)(C) (1982), requires that all agencies of the Federal Government include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Appellant argues that the Service violated NEPA in several ways: (A) in failing to prepare an Environmental Impact Statement, (B) in issuing an EIR/EA which failed to discuss all reasonable alternatives; and (C) in failing to prepare a "worst-case scenario" based on new information. Appellant's attempt to raise an issue of material fact with regard to the Service's compliance with the requirements of NEPA is without merit.

### A. *Standard of Review-Administrative Decisions Under NEPA*

■ We review the Service's actions concerning the NEPA provisions at issue in this case under a reasonableness standard. *See Foundation for North American Wild Sheep v. United States Department of Agriculture*, 681 F.2d 1172, 1177 (9th Cir.1982); *California v. Block*, 690 F.2d 753, 767 (9th Cir.1982).

### B. *Issuance of the Permit did not require preparation of an Environmental Impact Statement in addition to the EIR/EA.*

■ NEPA requires federal agencies to prepare an Environmental Impact

Statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (1982). An Environmental Impact Statement must be prepared when substantial questions are raised on whether a project may cause significant degradation of the environment. *City and County of San Francisco,* 615 F.2d at 500 (quoting *City of Davis v. Coleman,* 521 F.2d 661, 673 (9th Cir.1975) ). All parties agree that the project at issue involves major federal action. The question is whether the Service properly determined that the project would not significantly degrade the environment. An agency's decision not to prepare an Environmental Impact Statement should be upheld if reasonable. *Foundation for North American Wild Sheep,* 681 F.2d at 1177. *City and County of San Francisco,* 615 F.2d at 500. A court should not substitute its judgment for that of an agency if the agency's decision was "fully informed and well-considered." *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Our review of the administrative record leads us to conclude that the Service's determination that the project would not significantly affect the quality of the human environment and that, therefore, no Environmental Impact Statement was required, was reasonable.

Appellant relies primarily on its methodological criticisms of the Biological Study in arguing that the Service's failure to prepare an Environmental Impact Statement was unreasonable. Essentially, Appellant argues that because the data base upon which the Service relied was faulty, its EIR/EA does not satisfy NEPA's requirement that information sufficient to enable the Service to make a rational decision must be disclosed in the EIR/EA. We conclude that appellant's contention is without merit.

■ NEPA does not require that we decide whether an EIR is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology. *See Hart and Miller Islands Area Environmental Group, Inc. v. Corps of Engineers of the U.S. Army,* 505 F.Supp. 732, 755 (D.Md.1980); *Cabinet Mountains Wilderness v. Peterson,* 510 F.Supp. 1186, 1190–91 (D.D.C.), *affirmed* 685 F.2d 678 (D.C.Cir.1982). Our task is simply to ensure that the procedure followed by the Service resulted in a reasoned analysis of the evidence before it, and that the Service made the evidence available to all concerned. *Save Lake Washington v. Frank,* 641 F.2d 1330, 1337 (9th Cir.1981); *Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir.1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

The Service, in the present case, sought out and considered extensive comments on the Biological Study during the public comment period and afterward, and incorporated these comments into its Permit Findings and final Plan. Because the Service was unaware of appellant's specific field study criticisms before making its decision, we certainly cannot fault the Service for failing to address these criticisms.

Appellant next contends that an immense "controversy" surrounded the Permit's issuance and compares this case to *Foundation for North American Wild Sheep,* 681 F.2d at 1182, in which we found that the action involved was precisely the type of "controversial action" that required an Environmental Impact Statement. These two cases are not analogous, however. In *Foundation for North American Wild Sheep,* the court referred to the "numerous responses from conservationists, biologists, and other knowledgeable individuals, *all* highly critical of the EA and *all disputing the EA's conclusion. . . .*" *Id.*

■ In the present case, quite to the contrary, virtual agreement exists among local, state, and federal government officials, private parties, and local environmentalists on the development of the Mountain and on the content of the EIR/EA. Only appellant and its two experts are critical of the Biological Study on which the development plans and the EIR/EA are based. In

fact, the extensive coordination and agreement between the state and federal government is a factor supporting the Service's decision not to prepare an Environmental Impact Statement. As we stated in *Goodman Group, Inc. v. Dishroom,* 679 F.2d 182 (9th Cir.1982):

> While the foregoing discussion suffices to demonstrate that the agency did not err in its interpretation of NEPA, a further significant factor in support of the agency's action should be noted. HUD worked in concert with local officials and acted consistently with local policies on land use. *We have specifically recognized such compliance is a factor pointing toward the validity of a conclusion and that there is no significant impact on the environment.* Where a federal project conforms to existing land use patterns, zoning, or local plans, such conformity is evidence supporting a finding of no significant impact. *Preservation Coalition, Inc. v. Pierce,* 667 F.2d at 861.

*Id.* at 186 (emphasis added).

Finally, courts have permitted the effect of mitigation measures to be considered in determining whether preparation of an Environmental Impact Statement is necessary. *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 860 (9th Cir.1982); *City and County of San Francisco,* 615 F.2d at 501. Contrary to appellant's assertions, therefore, the mitigation measures at the heart of the Plan seem to comply with the strict standard set forth in *Cabinet Mountains Wilderness,* 685 F.2d at 682. In that case, the D.C. Circuit held that an Environmental Impact Statement is not required when "specific mitigation measures ... *completely* compensate for any possible adverse environmental impacts stemming from the original proposal...." 685 F.2d at 682 (emphasis added). As previously discussed, the Plan's mitigation measures include extensive land dedications, a permanent habitat conservation and enhancement program, highly restrictive development and construction controls, interim and permanent funding for the habitat protection program, and measures to en-

sure the cooperation of all government agencies having jurisdiction of the area. The Service concluded from these mitigation measures that the Permit and the Plan would be likely to *enhance,* not reduce, the chances for survival of the endangered species including the Mission Blue butterfly.

■ Even if the mitigation measures in the present case would not *completely* compensate for all adverse environmental impacts, this shortcoming would not be detrimental. In this circuit, so long as significant measures are undertaken to "mitigate the project's effects," they need not *completely compensate* for adverse environmental impacts. *See Preservation Coalition,* 667 F.2d at 860.

In light of the foregoing, we find that the Service acted reasonably in not issuing an Environmental Impact Statement in the present case. The Service conducted a thorough analysis of the proposed action and imposed specific mitigation measures. For us to overturn the Service's decision would present "an unjustifiable intrusion into the administrative process." *See Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears,* 685 F.2d at 684 (citation omitted).

C. *The Environmental Impact Report/Environmental Assessment adequately discusses reasonable alternatives to the proposed action.*

NEPA requires federal agencies to prepare a "detailed statement ... on ... alternatives to the proposed action...." 42 U.S.C. § 4332(2)(C)(iii) (1982). In addition, section 4332(2)(E) directs agencies specifically to "study, develop, and describe appropriate alternatives to recommended courses. of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." Appellant contends that because the Service did not conduct a full environmental disclosure through preparation of an Environmental Impact Statement, the Service failed to completely discuss the role of alternatives to the Project.

An agency need only set forth those alternatives necessary to permit a "reasoned choice." *California v. Block,* 690 F.2d at 767; *Life of the Land,* 485 F.2d at 472. The EIR/EA listed various alternatives to issuance of the Permit, including those of "no development," more limited development, and public acquisition of all private land on the Mountain.

Appellant's primary argument concerning alternatives is that the EIR/EA did not adequately consider the alternative of developing the Saddle Area which lacks the biological value of certain of the other areas now proposed for development.

The EIR/EA did contain a brief discussion on the alternate development of the Saddle Area, and rejected it. The Saddle Area contains significant environmental resources which the County apparently wishes to preserve. The County considered and rejected Visitacion's development of the Saddle in 1976, which resulted in Visitacion's donation of its Saddle lands to the County and the State. Moreover, the Saddle Area allegedly contains unique wetlands and endangered plants, and its development could meet with stiff environmental opposition. NEPA does not demand a full discussion of land use alternatives "whose implementation is deemed remote and speculative." *Life of the Land,* 485 F.2d at 472. *See also Maryland Wildlife Federation v. Dole,* 747 F.2d 229, 241 (4th Cir.1984) (quoting *Vermont Yankee Nuclear Power Corp.,* 435 U.S. at 551, 98 S.Ct. at 1215) ("A detailed statement of alternatives will not be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.' ").

D. *A "worst-case" scenario is not warranted in the present case.*

Appellant contends that NEPA requires the EIR/EA to contain a "worst case analysis."

A "worst-case" analysis entails weighing the need for a proposed action against the worst possible consequences of such action. NEPA requires a "worst case analysis" when "the information relevant to adverse impacts is essential ... and is not known and the overall costs of obtaining it are exorbitant or ... the information ... is important and the means to obtain it are not known...." *Save our Ecosystems v. Clark,* 747 F.2d 1240, 1243 (9th Cir.1984); 40 C.F.R. § 1502.22 (1982).

We have interpreted this regulation as follows:

The purpose of the analysis is to carry out NEPA's mandate for full disclosure to the public of the potential consequences of agency decisions, and to cause agencies to consider those potential consequences when acting on the basis of scientific uncertainties or gaps in available information. The analysis is formulated on the basis of available information, using reasonable projections of the worst possible consequences of a proposed action.

*Save our Ecosystems,* 747 F.2d at 1244–45 (quoting 46 Fed.Reg. 18032 (Monday, March 3, 1981)).

In the present case, the Service obtained the impact information it needed from the Biological Study and Plan, and included it in the EIR/EA. This information helped to inform the Service and fostered extensive public participation.

Moreover, the fact that the staged development of the Mountain calls for corresponding staged reconsideration of environmental impacts under the Plan, as well as for possible revocation or suspension of the Permit, further supports our conclusion that the Service acted reasonably in determining that a "worst case" analysis was not necessary in the present case. *See Village of False Pass,* 733 F.2d at 614–616.

## CONCLUSION

For the foregoing reasons, we conclude that the Service complied with the provisions of the ESA and NEPA at issue in this case. We therefore affirm the district

court's grant of summary judgment in favor of appellees.

AFFIRMED.