BLUE OCEAN PRESERVATION SOCIETY, a Hawaii non-profit corporation; Sierra Club, a California non-profit corporation; Greenpeace Foundation, a Hawaii non-profit corporation, Plaintiffs,

v.

James D. WATKINS, Secretary, Department of Energy, et al., Defendants.

Civ. No. 90–00407 DAE.

United States District Court, D. Hawaii.

June 25, 1991.

Paul Spaulding, III, Arnold Lum, Sierra Club Legal Defense Fund, Inc., Honolulu, Hawaii, for plaintiffs.

Daniel A. Bent, U.S. Atty., D. Hawaii, Linda J. Joachim, Asst. U.S. Atty., Honolulu, Hawaii, Gary B. Randall, Atty., U.S. Dept. of Justice, Environment & Natural Resources Div., Office Litigation Section, Washington, D.C., for defendants.

ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND A PERMANENT INJUNCTION AND DENYING DEFENDANTS' COUNTER MOTION TO DISMISS THE CASE AS MOOT

DAVID A. EZRA, District Judge.

I. *Introduction*

This lawsuit seeks to compel preparation of a federal Environmental Impact Statement ("EIS") for the Hawaii Geothermal Energy Project (the "Project") and to enjoin any further federal participation in the Project until the EIS is completed. Last January on plaintiffs' and defendants' (or the "government" 's) motions for summary judgment, the court ruled that the remain-

ing phases of the project constitute "major federal action" within the meaning of the National Environmental Policy Act ("NEPA"). 42 U.S.C. § 4332(2)(C). Responding to the government's contention that the matter was not yet ripe, the court also ruled that there remained issues of fact (1) as to the Department of Energy's ("DOE" 's) level of commitment to the Project, and (2) as to DOE's role in implementation of the Project.

In the wake of that decision, DOE attempted to "reprogram" the $5 million Congress had already appropriated to the Project, but Congress rebuffed the attempt, and directed that at least some of the money be used toward an EIS. Plaintiffs have now brought a new summary judgment motion, arguing that given Congress' reaction to the reprogramming effort, the case is now ripe, and submitting substantial evidence of the Project's potential impact on the environment.

The government, rather than address plaintiffs' arguments for summary judgment on the merits, has simply moved for dismissal, arguing that the entire case is moot.

## II. *Background*

A complete statement of background facts is set forth in the court's Order Denying Defendant United States' Motion for Summary Judgment and Granting Plaintiffs' Motion for Partial Summary Judgment, filed January 8, 1991 ("January 8 Order"), published at 754 F.Supp. 1450 (D.Hawaii 1991). A brief summary of those facts follows, supplemented by the developments of the last six months.

### A. The Project

The Project is a cooperative venture of both the State of Hawaii and the federal government to facilitate the development of geothermal power as an alternative energy source in Hawaii. It involves four distinct stages or phases leading to the private development of a 500 megawatt geothermal power plant on the slopes of the Kilauea crater, an active volcano on the Island of Hawaii. The first two phases, involving (1) the building of a small plant for research and testing, and (2) research regarding the feasibility of transporting the power generated to other islands via underwater cable, have already been completed, and any attempt to obtain an EIS for those phases was deemed moot. January 8 Order, 754 F.Supp. at 1459. Phase III, entitled the Geothermal Resource Verification and Characterization Program, is now in progress, and involves the drilling of twenty-five (25) commercial-scale exploration wells throughout the Kilauea East Rift Zone in order to "verify" the geothermal resource. This verification will clear the way for Phase IV, the construction of the full 500 megawatt project.

Phase III is proceeding with funds appropriated by the Hawaii state legislature. So far, at least two slim-bore scientific observation holes ("SOHs") have been drilled, and four more are called for. It is anticipated that federal funds will be utilized to drill the 25 full-scale holes in areas "proven" by the SOH drilling.

Phase IV will involve the construction of up to twenty (20) separate geothermal power plants of about 25 megawatts apiece. Each of these will employ eight to ten working wells. The separate plants will necessarily be connected by a network of roads, plumbing, and power lines throughout the subzone areas. It will also involve the laying of overland and underwater cable to carry the power generated to the islands of Maui and Oahu.

### B. Federal Funding of the Project

As discussed by the court in its January 8 Order, 754 F.Supp. at 1453, Congress has thus far contributed $34.7 million, over 80% of the total funding, to Phases I and II of the Project, and had recently appropriated an additional $5 million toward Phase III.[1]

1. The legislative reports clearly earmarked this money for Phase III, the Geothermal Resource Verification and Characterization Project:

The conferees agree to provide $5,000,000 to continue the Hawaii geothermal resource verification and characterization project as described in the Senate report.

H.R.Conf.Rep. No. 889, 101st Cong., 2d Sess., 84 (1990) (Plaintiffs' Exhibit 3).

This $5 million was the first of three such appropriations anticipated from Congress over the next three years. 754 F.Supp. at 1455.

At the hearing on December 17, 1990, counsel for the government suggested that the $5 million appropriation did not bind DOE to use the money for the Project, and that DOE had not yet decided whether to continue its support of the Project. Unable to determine the validity of this claim on the evidence before it, the court determined that issues of fact remained as to (1) DOE's level of commitment to the implementation of Phase III, and (2) DOE's role with respect to the $5 million appropriation. 754 F.Supp. at 1465–66.

### 1. DOE's Reprogramming Request

After this court ruled that the government's participation in the Project constituted "major federal action" based largely on the $5 million appropriation, DOE sought to "reprogram" the money, and have it applied to another project. When DOE announced its intention to seek reprogramming at a pretrial conference on February 12, 1991, the court granted a continuance with the concurrence of all parties of the February trial date in order to permit DOE and Congress to settle the status of the funding.

Plaintiffs conducted some discovery on this reprogramming process, and obtained a single document from DOE: an internal memorandum dated December 1, 1986, detailing DOE's reprogramming procedure (the "Memo", Plaintiff's Exhibit 4). The Memo explicitly acknowledges that an agency is expressly forbidden from spending a Congressional appropriation for purposes other than those for which they were appropriated. 31 U.S.C. § 1301(a).

The Memo goes on to explain, however, that reprogramming may be sought by first clearing the request with the Office of Management and Budget, and then submit-

ting it to the appropriate Congressional committees. Memo at 2. Until Congress acts on the request, the funds are placed into a special DOE reserve account. Memo at 5. If the request for reprogramming is not approved, the funds must be used for the purposes stated in the original appropriation. Memo at 2.

There does not appear to be any other statutory or regulatory guideline governing the reprogramming procedure. DOE was simply pursuing its own prescribed method for obtaining Congressional approval to deviate from the terms of the original appropriation.

### 2. The Congressional Reaction to the Reprogramming Request

U.S. Senator Daniel K. Inouye strongly opposed the attempted reprogramming, and obtained, in conjunction with the 1991 Dire Emergency Supplemental Appropriations Bill, Conference Committee approval of language directing DOE to use

> such funds as are necessary from amounts previously provided to the State of Hawaii for geothermal resource verification and characterization to conduct the necessary environmental assessments and/or environmental impact statement (EIS) for the geothermal initiative to proceed.

H.R.Conf.Rep. No. 29, 102d Cong., 1st Sess. (1991) (appearing as Plaintiffs' Exhibit 13). In a colloquy between Senators Inouye and J. Bennett Johnston on March 19, 1991, the language was clarified to assure that any of the $5 million *not* used for an EIS would be applied to Phase III as originally specified. Plaintiffs' Exhibit 9 at 2–3.

DOE had made it clear that its primary concern in seeking the reprogramming was this very lawsuit, and the "possible precedent-setting outcome of the lawsuit requiring Federal preparation of such an EIS."

---

The Committee recommendation also includes $5,000,000 for the State of Hawaii through its department of business and economic development to continue the Hawaii geothermal resource verification and charac-

terization projects to help reduce the State's dependency on fossil fuels.
S.Rep. No. 378, 101st Cong., 2d Sess., 81 (1990) (Plaintiffs' Exhibit 3).

Plaintiff's Exhibit 8. In order to accommodate this concern about legal precedent, the language approved by the Conference Committee explicitly states that Phase III

> is research work not development or project construction work and is not a "major federal action" and therefore would not require an EIS pursuant to the National Environmental Policy Act (NEPA). However, the environmental sensitivity of this geothermal resource is so acute that the process required in an EIS is important, and shall be complied with in this case.

Plaintiffs' Exhibit 13. By employing this language, the government attempted to avoid acknowledging any *legal* obligation to conduct an EIS.

Notwithstanding the Conference Report's characterization of Phase III as "research work" that does not constitute "major federal action," the facts and law cannot support such a characterization. As noted in the January 8 Order, Phases III and IV are "connected actions" under NEPA regulations and must be made the subject of a single EIS. 754 F.Supp. at 1459. Moreover, the "research work" contemplated by Phase III alone easily satisfies the statutory standards for "major federal action" based simply on the extent of federal funding. *Id.* at 1466–67.

The characterization of Phase III as "research work not development or project construction work" does not speak to the "major federal action" requirement as much as it would to the "significantly affecting the quality of the human environment" requirement. For the reasons articulated herein, Section IV.B.2 *infra,* the court finds that Phase III also satisfies that requirement.

### III. *Motion to Dismiss for Mootness*

#### A. The Government's Motion

■ Although the government argues that the Conference Committee language

directing the use of appropriated funds to prepare an EIS "is not binding on the agency," Government's Memorandum at 5,[2] it now asserts that

> [t]he Department of Energy has decided to accede to the wishes of Congress and prepare an EIS on phases III and IV of the Hawaii Geothermal Project as finally proposed by the State of Hawaii.

Government's Memorandum at 2. The government also promises that it "will not participate in the Hawaii Geothermal Project, outside of the NEPA process, until completion of the EIS." *Id.* Based on its decision to prepare an EIS, and its promise not to participate in the Project until the EIS is done, the government argues that the case is moot.

In support of its argument, the government cites a series of cases defining mootness: *S.E.C. v. Medical Committee for Human Rights,* 404 U.S. 403, 407, 92 S.Ct. 577, 580, 30 L.Ed.2d 560 (1972) (there must be an actual case or controversy); *Steffel v. Thompson,* 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1216 n. 10, 39 L.Ed.2d 505 (1974) (the controversy must exist at all stages of review); *Allard v. DeLorean,* 884 F.2d 464, 466 (9th Cir.1989) (a case becomes moot when it loses its character as a live controversy); *Garcia v. Lawn,* 805 F.2d 1400, 1402 (9th Cir.1986) (a case is moot if there is no meaningful relief available to plaintiffs). Its argument is that plaintiffs will get their EIS in any case, that the need for an EIS therefore is no longer a live issue because there is no meaningful relief the court can order beyond what the defendant DOE has suggested it will provide.

#### B. The Plaintiffs' Response to the Mootness Argument

##### 1. *The Illusory Nature of DOE's Promises*

Plaintiffs, however, take little comfort in DOE's "decision" to perform an EIS and

---

**2.** In making this claim, the Government relies on *Intern. Union v. Donovan,* 746 F.2d 855, 861 (D.C.Cir.1984) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees

fit."). The court is not persuaded that the Congressional appropriation at issue here is such a "lump-sum appropriation." The appropriation was very specifically earmarked. *See* footnote 1 *supra.*

DOE's "promise" to withhold any participation in the Project until the EIS is complete. The record in this case supports plaintiffs' concerns. Most disturbing is the acute possibility that DOE may yet again change its mind or renege on its stated intent. Plaintiffs note that DOE has in fact changed its position several times already in an attempt to avoid adjudication in this case. Plaintiffs' Exhibits 6 and 8. This gives rise to serious questions regarding the immutability of DOE's decision and promise.

In addition, the government unequivocally states its position that it is *not* required to prepare an EIS. It has consistently maintained that NEPA does not require it and that Congress' directive does not require it. Defendants' Memorandum at 5 ("[T]he language ... is not binding on the agency."). Thus the government reaffirms its position that nothing but its own volition is prompting the preparation of the EIS, and in so doing concedes that nothing would prevent it from again changing its position.

### 2. The Inadequacy of the Actions Promised

But even if DOE adheres to its latest decision, what it has "decided" and "promised" falls short of what plaintiffs have sought in this case. Plaintiffs allege, among other things,

a. *The government does not say when it will begin the EIS process*—plaintiffs seek *immediate* preparation of an EIS;

b. *The government promises to prepare an EIS on Phases III and IV only "as finally proposed by the State of Hawaii"*—this leaves open the possibility that the state may attempt to redefine the Project for NEPA purposes, or that DOE will postpone the EIS indefinitely, awaiting some kind of "final proposal" from the state;

c. *The government intends to continue to participate in the Interagency Group, to process federal permits, and to continue with unspecified "appropriate action" while the EIS is being prepared*—plaintiffs seek to enjoin *all* federal participation until the EIS is complete;

d. *The government's promise involves only DOE*—plaintiffs seek to enjoin the participation of *all* defendants in the Project until the EIS is complete.

Pointing out these shortcomings in the government's promises, plaintiffs argue that such "illusory and nonspecific" promises cannot render the case moot. Plaintiffs' Reply Memorandum at 10.

### 3. Application of the Mootness Doctrine

The burden of demonstrating mootness is a heavy one. *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); *Northwest Environmental Defense Center v. Gordon*, 849 F.2d 1241, 1244 (9th Cir.1988). The question of mootness " 'is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be *any* effective relief.' " *Gordon*, 849 F.2d at 1244–45 (quoting *Garcia v. Lawn*, 805 F.2d 1400, 1403 (9th Cir.1986) (emphasis provided in *Gordon* )).

■ This is not a case in which the government has already prepared an EIS, or even commenced such preparation.[3] Plaintiffs cite numerous cases for the proposition that a suit to compel future action is moot only after it has been "fully and irrevocably carried out." *E.g., University of Texas v. Camenisch*, 451 U.S. 390, 398, 101 S.Ct. 1830, 1835, 68 L.Ed.2d 175 (1981). To the court, this seems axiomatic. Accordingly, a suit to compel an EIS is rendered moot *when the EIS is completed* and filed. *Romero–Barcelo v. Brown*, 643 F.2d 835, 862 (1st Cir.1981); *City of Newport Beach v. Civil Aeronautics Board*, 665 F.2d 1280 (D.C.Cir.1981); *Upper Pecos Association v. Stans*, 500 F.2d 17 (10th Cir.

---

**3.** EIS preparation commences with the publication of a notice in the Federal Register, as required by 40 C.F.R. § 1501.7. To date, no such publication has occurred.

1974). Here, of course, the EIS process is not only unfinished, it has not begun.[4]

Moreover, there are a number of issues raised by the suit that the government has failed to address. *See* items (a)-(d) in Section III.B.2, *supra.* Had the government come forward with specific commitments on these points, its claim of mootness might have more force. In fact, DOE's affidavit, from Deputy Assistant Secretary Robert L. San Martin, makes absolutely no commitment as to the timing of the promised EIS. It does not bind any agency defendant other than DOE.[5] It does not speak to the issue of continued federal participation in the Interagency Group, in issuing permits for various aspects of the Project, in advising and consulting with state and private interests working on the Project. All of this plaintiffs seek to enjoin; the suit cannot be moot as long as the government ignores these additional demands.

### 4. The "Voluntary Cessation" Exception to the Mootness Doctrine

Even if DOE's promises were sufficient to deprive the court of jurisdiction under traditional notions of mootness, these facts fall squarely within a well-established exception to the mootness doctrine: "the voluntary cessation of allegedly illegal conduct." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953), *quoted in County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).

The U.S. Supreme Court has recognized that, as a general rule, such voluntary cessation will not deprive the court of jurisdiction. *Id.; see also Armster v. United States District Court*, 806 F.2d 1347, 1357 (9th Cir.1986) ("a change of activity by a defendant under the threat of judicial scrutiny is insufficient to negate the existence of an otherwise ripe case or controversy"). The "voluntary cessation" exception is rooted in the policy that a party should not be able to insulate itself from any challenge to its illegal conduct simply by suspending the illegal activity whenever a legal action is brought; otherwise there would be no check on that party's resumption of the conduct after dismissal of the legal action. Accordingly, in such cases, the matter can be deemed moot only if (1) " 'there is no reasonable expectation ...' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631, 99 S.Ct. at 1383 (quoting *Grant*, 345 U.S. at 633, 73 S.Ct. at 898) (other citations omitted).

As applied by the Supreme Court, this test imposes a substantial burden on the movant. In *City of Los Angeles v. Lyons*, 461 U.S. 95, 100–01, 103 S.Ct. 1660, 1664, 75 L.Ed.2d 675 (1982), for example, the Court refused to moot a claim for injunctive relief against allegedly illegal police practices (choke-holds), despite the fact that those practices had been banned by administrative moratorium. Because the moratorium by its terms was not permanent, the moratorium was insufficient to ensure that the challenged actions would not recur. Similarly, in *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 1074–75, 71 L.Ed.2d 152 (1982), the Supreme Court held that a constitutional challenge of a city ordinance

---

4. Plaintiffs also note that a suit to compel an EIS may be rendered moot if the challenged action has already taken place and has already had its irreversible impact on the environment. *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir.1988) (mining operation was complete and therefore the suit over the EIS for the operation was moot), *compare Columbia Basin Land Protection Assoc. v. Schlesinger*, 643 F.2d 585, 591 n. 1 (9th Cir.1981) (power line had already been constructed, but challenge was not moot because relief could still be afforded by in the form of removal of the power line). Consistent with this analysis, Plaintiffs' suit for an EIS for Phases I and II was declared moot in the January 8 Order. 754 F.Supp. at 1459–60. This does not apply to Phases III and IV, however, which have yet to be carried out.

5. As already noted, it is not clear that it binds even DOE. *See* discussion in Section III.B.1 *supra.*

was not rendered moot by the redrafting of the ordinance:

> In this case the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated.

In the instant case, the government's decision to prepare an EIS and promise to withhold other funding until the EIS is completed fall far short of the showing required under these cases. The court is not persuaded that there is "no reasonable expectation that the alleged violation will recur." *See Davis,* 440 U.S. at 631, 99 S.Ct. at 1383. This conclusion is further strengthened by the fact that DOE has acknowledged no legal duty whatsoever:

> It has long been recognized that the likelihood of recurrence of challenged activity is more substantial when the cessation is not based upon a recognition of the initial illegality of that conduct. *Walling v. Helmerich & Payne, Inc.,* 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944) (defendant's decision to cease offering allegedly illegal contract terms two months after complaint was filed but before trial did not moot controversy where defendant failed to acknowledge illegality of conduct). *See also Alton & Southern Railway v. International Association of Machinists and Aerospace Workers,* 463 F.2d 872, 879 n. 13 (D.C.Cir.1972) ("a deliberate and persistent official interpretation is more likely to identify a 'recurring controversy' situation").

*Armster,* 806 F.2d at 1359–60 (footnote omitted). As already noted, the government has consistently claimed that it has no legal duty to prepare an EIS. It purports to be doing an EIS now only because it chooses to, based on a "nonbinding" Congressional suggestion.

### C. Conclusion

Based upon DOE's past conduct in this case there is no valid reason to assume DOE may not yet change its position further. The court therefore holds that the case cannot be rendered moot based on DOE's asserted intent. Even more compel-

ling is the government's failure to give any assurances regarding (1) the timing of the promised EIS, (2) the continued participation of the other non-DOE defendants in the Project, and (3) the continued involvement of all defendants in the Project in advisory and permitting roles. Finally, the court finds that even if the case might otherwise be deemed moot, it is clearly within the "voluntary cessation" exception, and should not be dismissed short of a full adjudication on the merits.

### IV. *Motion for Summary Judgment*

 Having concluded that the case is not moot, the court moves on to address the merits of plaintiffs' Motion for Summary Judgment. This motion received no response from the government whatsoever on the merits.

### A. The Government's Failure to Respond

The government, in its pretrial filings and in its failure to respond, has essentially conceded that if its mootness argument fails, plaintiffs are entitled to summary judgment. The government has failed to meet its burden under Rule 56(e) of the Federal Rules of Civil Procedure:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in the rule, must set forth specific facts showing that there is a genuine issue for trial. *If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.*

(Emphasis added.)

Plaintiffs' motion for summary judgment is amply supported by affidavits and other documentary evidence. *See* discussion Section IV.B. *infra.* The government can successfully oppose such a motion only by presenting its own evidence sufficient to raise a material issue of fact. In this case, the government has not only failed to come

forward with admissible evidence, it has failed even to submit arguments or pleadings on the issue.

### B. The Merits of the Motion

Section 102(2)(C) of NEPA requires federal agencies to prepare and file an EIS before undertaking "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The court determined, in its January 8 Order, that Phases III and IV constitute "major federal action" within the meaning of the statute, based on the $5 million already appropriated to it, as well as the substantial overall federal funding and active participation in the Project. 754 F.Supp. at 1466–67. Because DOE's reprogramming effort failed, and the $5 million appropriation survives, there is no basis for revisiting that issue.

#### 1. Ripeness

In the January 8 Order, however, the court found issues of fact relating to the question of ripeness. 754 F.Supp. at 1465–66. Specifically, because DOE claimed that it was not necessarily committed to the Project, and because DOE professed to have power to divert the appropriation to other uses, it was not clear that the time was ripe to *compel* an EIS. Given the developments of the last six months, however, the uncertainty has evaporated. DOE's attempt to reprogram the money failed. It is this court's view that notwithstanding the government's attempt to argue otherwise, *see* footnote 2 *supra*, DOE is required to use the money as directed by Congress. 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."); *see* discussion and authorities in the January 8 Order, 754 F.Supp. at 1464–65. The matter is now ripe.

#### 2. "Significantly Affecting the Quality of the Human Environment"

Having established that the government's participation in the Project constitutes "major federal action," and that the action to compel an EIS is ripe, the only substantive question that remains is whether the action is one "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

##### a. The Statutory Standard

 Where an agency has determined that the proposed action will not significantly affect the human environment, a court must examine that determination for reasonableness. *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985). The agency's decision should be upheld if it is reasonable, *i.e.,* if it is " 'fully informed and well-considered.' " *Id.* (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978)). Because it is the EIS itself which will reveal whether and to what degree the proposed action will affect the human environment, the preliminary decision of whether to do an EIS is necessarily based on incomplete and uncertain information. Accordingly, it is not necessary for plaintiffs to *prove* significant effects on the environment in order to prevail in their suit seeking an EIS. It is sufficient to raise "substantial questions ... regarding whether the proposed action *may* have a significant effect upon the human environment." *Save the Yaak Committee v. Block,* 840 F.2d 714, 717 (9th Cir.1988) (emphasis in original) (if such substantial questions are raised, "a decision not to prepare an EIS is unreasonable"); *Foundation for North American Wild Sheep v. U.S. Dept. of Agriculture,* 681 F.2d 1172, 1178 (9th Cir.1982).

The evidentiary offering on this issue is entirely uncontroverted. As indicated, to carry their burden of proof plaintiffs need only raise questions about whether the Project *may* significantly affect the environment. The court is satisfied that this burden has been met many times over in the series of expert witness affidavits, scientific reports, illustrative maps, correspondence and other documents filed by plaintiffs with their motion.

### b. The Evidence Offered to Show "Significance"

The land-based aspect of the Project itself contemplates a network of geothermal plants, wells, power lines, roads and pipes over 26,000 acres, many of them located in the Wao Kele O Puna forest. In 1981, then Governor Ariyoshi formally designated the Wao Kele O Puna forest a Natural Area Reserve, in recognition of its importance as "an environmental and natural heritage site" as well as a "research site" that would "preserve a gene pool of native plant and animal species, particularly of rare and endangered species." Plaintiffs' Exhibit 26 at 2–4. This Natural Area Reserve designation was later revoked in a "land exchange" in order to facilitate the proposed geothermal development.

In the hearings on the land exchange proposal, James Jacobi of the U.S. Fish and Wildlife Service ("FWS", a defendant in this action) testified that the forest is "a unique dynamic ecosystem, valuable for both research on and management of the lowland rain forest habitat on the island of Hawaii." Plaintiff's Exhibit 29 at 2. He cautioned against the adverse impact geothermal development would have on the ecosystem, as well as the endangered plant and animal species found there. *Id.*

In addition, three experts—an ornithologist, a geneticist, and a botanist—all affiliated in some way with the University of Hawaii and intimately acquainted with native Hawaiian species and habitats, have submitted affidavits expressing grave concern for the environmental impact of the Project with respect to each of their respective fields. These affidavits alone, uncontroverted by any evidence submitted by the government, easily raise the "substantial questions" of possible environmental impact sufficient to require an EIS under that provision of the statute.

Plaintiffs supplement these evidentiary offerings with reports discussing everything from the Project's economic impact to its speleological impact.[6] There is also substantial evidence submitted on the impact of the deep-water cable aspect of the Project on Hawaii's marine environment. The court is impressed that by any measure, plaintiffs have met their burden, and that the Project is one that may significantly affect the quality of the human environment.

### C. Conclusion

Having demonstrated "major federal action" in the previous hearing, *see* 754 F.Supp. 1450, and now having established ripeness and "significance," plaintiffs have proven their case on the merits. Accordingly, they are entitled to summary judgment.

### V. *Motion for an Injunction on Federal Participation Until the EIS is Complete*

In addition to the injunction ordering the immediate preparation of an EIS, to which plaintiffs are entitled by virtue of the summary judgment hereby granted, plaintiffs seek an injunction barring any further federal participation in the Project until that EIS is completed.[7] The court finds that because plaintiffs have already prevailed in their action, there is no point in engaging in the typical "preliminary injunction" analysis. *See, e.g., United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 174 (9th Cir.1987). The "likelihood of success on the merits" and the "balance of hardships" are not meaningful concepts given the summary judgment decision already rendered.

---

**6.** "Speleology" is defined as the study of caves.

**7.** It is noteworthy that Plaintiffs seek to enjoin only the *federal* participation in the Project. There is authority suggesting that in a case such as this one, where the challenged action is a cooperate federal-state enterprise, *all* activity may be enjoined pending preparation of an adequate EIS. *Biderman v. Morton,* 497 F.2d 1141,

1147 (2d Cir.1974) ("It is well settled that non-federal parties may be enjoined, pending completion of an EIS, where those non-federal entities have entered into a partnership or joint venture with the Federal Government, and are thus recipients of federal funding"); *see also Dalsis v. Hills,* 424 F.Supp. 784, 787 (W.D.N.Y.1976).

The important principle here is the court's power to fashion an appropriate remedy to serve the purposes of NEPA. In the January 8 Order, the court drew on the regulations as well as Ninth Circuit authority to define the fundamental purposes for NEPA's EIS requirement:

> NEPA's clear intent, as interpreted by the accompanying regulations [is manifest]:
>
>> The [environmental impact] statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made.
>
> 40 CFR § 1502.5. The Ninth Circuit has joined in this refrain, stressing that "[t]he purpose of an EIS is to apprise decision-makers of the disruptive environmental effects that may flow from their decisions *at a time when they 're-tain[ ] a maximum range of options.'* " *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir.1988) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C.Cir. 1983)) (emphasis added), *cert. denied sub nom. Sun Exploration and Production Co. v. Lujan*, 489 U.S. 1012 [109 S.Ct. 1121, 103 L.Ed.2d 184] (1989). In any case, the statement "must be prepared before any irreversible and irretrievable commitment of resources." *Conner v. Burford*, 848 F.2d at 1446. The Ninth Circuit has further warned that "delay in preparing an EIS may make all parties less flexible. After major investment of both time and money, it is likely that more environmental harm will be tolerated." *Environmental Defense Fund v. Andrus*, 596 F.2d 848, 853 (9th Cir.1979).

754 F.Supp. at 1461.

If these purposes of NEPA are to be served, no further federal resources may be committed to the Project until the EIS is completed. If the EIS is to play any role at all in the decisionmaking process, if the serious environmental concerns raised in this case are to be given any weight at all in the planning and fashioning of this Project, all federal participation in the Project itself, with the exception of work and funding necessary to accomplish the preparation of an EIS, must be suspended until that EIS can be prepared and filed.

Federal "participation" is defined for purposes of this order to include any decisionmaking or facilitating role in the Project. The government may not fund the Project, process permit applications or issue permits, or participate in interagency meetings in such a way as to further the development of the Project. The bar on federal participation will not, however, prevent the government from attending interagency meetings and otherwise keeping itself apprised of the Project's status.

The government has taken this Project as far as it possibly can without complying with NEPA. The policies embodied in NEPA will tolerate nothing short of an absolute bar on further federal participation, as defined herein, in the Project until NEPA is complied with.

## VI. *Conclusion*

For the reasons herein stated, plaintiffs' motion for summary judgment is GRANTED, the government's motion to dismiss the case for mootness is DENIED, and the government is ordered to commence forthwith the preparation of an EIS in compliance with NEPA, so as to address the serious concerns raised regarding the environmental impact geothermal development as proposed may have upon the land and within the waters of the State of Hawaii. The government is—*i.e.*, all defendants are—permanently enjoined from any further participation in the Project other than the funding and work necessary for the preparation of the EIS itself until such EIS is complete.