## FRIENDS OF PIONEER STREET BRIDGE CORP., Plaintiff,

v.

FEDERAL HIGHWAY ADMINISTRATION ("FHWA"); Vincent Schimmoler, in his capacity as Deputy Executive Director of FHWA; Norman Mineta, in his capacity as Secretary of the U.S. Department of Transportation; Charles E. Basner, in his capacity as FHWA Division Administrator for Vermont; Kenneth Sikora, in his capacity as FHWA Environmental Program Manager for the Pioneer Street Bridge Project; Vermont Agency of Transportation ("VTRANS"); Brian Searles, in his capacity as Secretary of VTRANS; Micque Glitman, in her capacity as Deputy Secretary of VTRANS; Dennis Benjamin, in his capacity as Environmental Chief; John Perkins, in his capacity as VTRANS Director of Technical Services, Defendants,

and

Frederick Bashara, d/b/a Launderama; Guy's Farm & Yard; Barre Street Beverage & Redemption Center; DC's Hair Creations; Property Design, Inc.; S/R Janitorial Services, Inc.; Fothergill, Segale & Valley, P.C.; Steve's Small Engine Repair; Barre Street Market; Fisher Auto Parts, Inc.; Dernavich Associates, Inc., d/b/a Desilets Granite Company; I B's Auto Repair; Aja–Zorzi Farm; Berlin Veterinary Clinic; Bevin's Marine & Cycle Center, Inc.; James A. Palmisano, Esq.; National Clothes Pin Company, Inc.; Northeast Granite Company; Montpelier Granite Works, Inc.; Lamberton Electric; George's Auto; Allen Lumber Company; Honda Unlimited; Barrett Enterprises; LIL' Duke & Son; Walbridge Electric, Inc.; the Source; Ageless Industrial Marking; Granite & Quartzite Centre Inc.; S.L. Garand Company, Inc.; Garand–Teed Granites, Inc.; and Trading Post, Defendant–Intervenors.

No. 2:01–CV–114.

United States District Court, D. Vermont.

June 29, 2001.

Cindy Ellen Hill, Law Office of Cindy Hill, Middlebury, VT, for plaintiff.

Nancy J. Creswell, AUSA, Office of the United States Attorney, District of Vermont, Burlington, VT, for Charles E. Basner, Kenneth Sikora.

Thomas Radford Viall, Vermont Agency of Transportation, Montpelier, VT, John Kevin Dunleavy, Vermont Agency of Transportation, National Life Building, Montpelier, VT, for defendants.

Michael Popowski, III, Law Office of Michael Popowski, Northfield, VT, for defendant–intervenors.

## OPINION AND ORDER

SESSIONS, District Judge.

This is an appeal from the administrative record regarding the fate of the historic Pioneer Street Bridge in Montpelier, Vermont. The Friends of the Pioneer Street Bridge Corporation ("FPSB" or "Plaintiff"), a nonprofit corporation, brought this action under the Administrative Procedures Act. The original defendants to this action were the Federal Highway Administration ("FHWA"), the Vermont Agency of Transportation

("VTRANS"), and several officers or employees of FHWA and VTRANS, in their official capacities, who have been responsible for making the decisions regarding the relevant issues in this case (collectively referred to as "the government defendants"). In an effort to resolve the case as quickly as possible, the Court agreed to an expedited summary judgment schedule and both parties moved for summary judgment. On June 11, 2001, a group of property owners, residents, and business owners located on Barre and Pioneer Streets moved to intervene as defendants and join the government defendants' cross-motion for summary judgment.[1] The Court heard oral argument on all pending motions on June 12, 2001, and granted the motion to intervene.[2] For the reasons that follow, Plaintiff's motion for summary judgment (Paper 13) is **DENIED** and Defendants' cross-motion for summary judgment (Paper 19) is **GRANTED**.

## I. Background

The Pioneer Street Bridge (or "Montpelier Bridge No. 6") is a 140′ single span Pratt through truss bridge with straight top chords carrying Pioneer Street over the Winooski River on the edge of the historic district in Montpelier, Vermont. The bridge was built in 1929 and is one of fifty-four bridges remaining among the many that were built following Vermont's disastrous floods (which washed away more than 1,200 bridges) in 1927. Pioneer Street is classified as an "urban collector," and is one of four highway structures running in an approximate north/south direction across the Winooski River. The bridge currently has a twenty-foot wide roadway and an extremely sharp turn at the north end. Until recently, due to its overall poor condition and the advanced deterioration of the floor system, the bridge had been restricted to a one-lane, alternating direction crossing with traffic flow controlled by signals at either end and had a three-ton load restriction, essentially prohibiting truck use. Because of its current state of disrepair, however, the bridge has since been closed to all traffic (including pedestrians). *See* State Defs.' Status Report Re: Cond. of Pioneer Street Bridge at 2 (Paper 16). The bridge is individually eligible for listing in the National Register of Historic Places,[3] but is not a National Historic Landmark.

FPSB is a nonprofit corporation whose corporate statement of purpose is: "To

---

1. Actually, the defendant-intervenors entitled their motion as one to intervene and *dismiss*. *See* Mot. to Intervene and Dismiss at 1 (Paper 25). However, the Court understands that their intent was to join the cross-motion for summary judgment and treats their motion accordingly.

2. At the hearing, Plaintiff stated that it had no objection to the motion to intervene.

3. The National Register of Historic Places "is the nation's list of significant historic buildings, district [sic], structures, objects and sites." *See* Admin. R. ("A.R.") 236 at III.1 (Paper 15).

    To be eligible for the National Register, a bridge (or any other property) must be at least 50 years old and must possess integrity of location, design, setting, and materials. Moreover, according to the criteria for listing in the National Register the bridge must

    — be associated with events which have made a significant contribution to the broad patterns of our history (Criterion A) or

    — embody the distinctive characteristics of a type, period, or method of construction; represent the work of a master; or possess high artistic values (Criterion C). *Id.* "Normally, properties which have been moved from their original location are not eligible for the National Register. However, this exclusion does not generally pertain to historic bridges, since their eligibility rests mostly upon Criterion C, their significance as representative examples of particular types of construction." A.R. 236 at III.1–2.

protect the welfare of the Barre Street community and the City of Montpelier as a whole." *See* First Am. Compl. ¶ 6 (Paper 7). It brings this lawsuit under the Administration Procedures Act as a party aggrieved by two administrative actions of the FHWA, on which VTRANS (as a project applicant) had federal statutory duties. Specifically, FPSB challenges two determinations made by one or more of the defendants: (1) VTRANS' decision (with which the FHWA officially concurred) to "categorically exclude" the proposed Pioneer Street Bridge construction project from environmental review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and (2) the FHWA's "Programmatic 4(f) determination" that there was no "feasible and prudent alternative" to the proposed "use" of the Pioneer Street Bridge and that all measures had been taken to minimize harm from such use. Plaintiff alleges that neither of these decisions was properly documented or supported by the administrative record, and that in fact, the administrative record supports contrary conclusions from those reached by the government defendants. Thus, Plaintiff asserts, both decisions were arbitrary, capricious, and otherwise not in accordance with law.

Plaintiff therefore seeks declaratory and permanent injunctive relief, asking this Court to require the federal defendants to comply with NEPA by assessing, with public involvement, the environmental impacts of the proposed project; similar relief with respect to the government defendants' alleged noncompliance with 4(f) requirements for evaluation prior to the use of historic sites; to prohibit the awarding of bids for construction of the project; and to prohibit any removal of or damage to the current structure, or any groundwork that would impact the archaeological site, until a legally adequate environmental assessment or impact statement and legally adequate 4(f) studies are completed.

## A. Summary of the Administrative Record

### 1. Historic and engineering studies

Four studies—two specific to the Pioneer Street Bridge and two addressing historic bridges in Vermont generally—are included in the record as investigations upon which the government defendants relied in making the relevant decisions in this case.

### a. Vermont Historic Bridge Survey

In 1985, the Vermont Division for Historic Preservation sponsored a survey of Vermont's historic bridges (the "Vermont Historic Bridge Survey") which categorized the bridges into three groups: "those which appear ineligible [for listing in the National Register of Historic Places], those which appear clearly eligible as outstanding historic resources, and those which meet the criteria [for National Register listing] but are not rare examples." A.R. 236 at III.5. According to that survey, approximately thirty bridges were classified as "clearly eligible as outstanding historic resources" based on their possession of certain exceptional characteristics (e.g., architectural features, age, rarity, etc.). The Pioneer Street Bridge, however, was assigned to the second group (eligible for listing, but without exceptional individual significance). *See* A.R. 236 at App. 5.8.

### b. The Holden Report

In 1992, VTRANS engaged Holden Engineers & Surveying, Inc. to conduct an "Engineering Alternative Study" of the Pioneer Street Bridge, the report of which was produced in April 1995 (the "Holden Report"). *See* A.R. 237. One of the stated purposes of the study was to evaluate two basic alternative solutions to "the cur-

rent structural and geometric deficiencies" of the bridge: (1) rehabilitation of the existing truss span and (2) replacement of the existing structure with a new bridge. A.R. 237 at 1.

Holden performed an "in-depth field inspection and a structural load rating analysis" of the Pioneer Street Bridge. A.R. 237 at 50. The report concluded that the "condition of the existing floor system . . . warranted total replacement." *Id.* It also noted that its twenty-foot roadway width combined with an average daily traffic greater than 5,000 has been "considered a 'basically intolerable condition requiring high priority of replacement'." A.R. 237 at 15. It further concluded that other safety features (such as railings) did not meet "currently acceptable standards." *See id.* It made a detailed recommendation of corrective actions, concluding that many of the structural elements required replacement or repair based on their inspected condition and load rating analysis. *See* A.R. 237 at 23. It also addressed a variety of roadway alignment options to facilitate either the existing bridge or a replacement structure. *See* A.R. 237 at 24–30.[4]

### c. The Pioneer Street Bridge Plan

In April 1997, VTRANS hired another group of engineers to prepare a "Historic Metal Truss Bridge Plan" for the Pioneer Street Bridge (the "Pioneer Street Bridge Plan"). *See* A.R. 238. The Pioneer Street Bridge Plan concluded that the "structure, in general, is in poor condition." A.R. 238 at 1. It further stated that "[t]he structure also has several deficiencies, including the poor alignment of the north approach and narrow roadway width," *id.,* and the "roadway width of 20' is below the State Standard recommended minimum of 26' for this bridge to remain in place," A.R. 238 at 2.

The Pioneer Street Bridge Plan considered six "rehabilitation alternatives" for the Pioneer Street Bridge: (A) rehabilitation in place for limited vehicle use; (B) rehabilitation in place for unrestricted vehicle use; (C) rehabilitation in place for adaptive use (this alternative would require that a new bridge on a new alignment also be built); (D) relocation for adaptive use (this alternative would require that a new bridge be built on an improved Pioneer Street alignment); (E) use of trusses as false facia on a new bridge; and (F) documentation and demolition. *See* A.R. 238 at 3, 17–19. After discussing each alternative's advantages and disadvantages, the study concluded that alternative (D) (relocation for adaptive use) was the most desirable because it "provides two beneficial crossings . . . ." [5] *See* A.R. 238 at 25–26.

---

4. Defendants allege that after reviewing four possible alternatives (two involving rehabilitation and two involving replacement), the Holden Report concluded that the Pioneer Street Bridge should be replaced with a new steel plate girder bridge, based upon "Long Term Traffic Goals" and "Benefit–Cost Factors." *See* Mem. in Supp. of Cross–Mot. for Summ. J. and Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 7 (Paper 20) [hereafter, "Defs.' Mem."]. However, the record does not support this contention. The Holden Report evaluates each alternative but does not come to any specific conclusion about which alternative is most desirable. The Holden Report did, moreover, state that the historical significance

of the bridge was outside of its scope. *See* A.R. 237 at 53.

5. The Pioneer Street Bridge Plan also concluded that alternative (C) (restoration/rehabilitation in place for adaptive use) "would be considered desirable" if "a suitable alignment for a new vehicular crossing is available." A.R. 238 at 25. However, it noted that "[a]lignment options for a new vehicular crossing are restricted in this urban area, specifically by a dam upstream and the alignment of U.S. Route 2 and other roads on each side of the river. The cost of acquiring the right-of-way for new approaches could add a significant amount to the overall cost of the

The conclusion of the Pioneer Street Bridge Plan "supports the City's desire to build a new bridge on the existing alignment, and relocate the historic truss within the city as a crossing for the planned recreation path." A.R. 238 at 2. The Plan also notes that "this bridge is historically important, and a striking visual feature of the local streetscape. Although it is not in the Montpelier Historic District, its close proximity certainly contributes to the historic atmosphere of the city." *Id.* It suggests that rehabilitation and relocation of the bridge for recreational use "will maintain the aesthetic and historic value of the structure at a new site, while providing an HS25 (45 tons) capacity crossing with a 28' wide roadway on the existing Pioneer Street alignment." *Id.*

Although the recommended clear minimum roadway width for the Pioneer Street Bridge is twenty-eight feet, *see* A.R. 238 at 12, state standards also "indicate that historic bridges should be considered for design exceptions, and for rehabilitation rather than replacement." *Id.* Nevertheless, the Pioneer Street Bridge Plan asserts that "[a]lthough this is a historic structure, the traffic volume, truck traffic and functional class of roadway indicate that a design exception for width would not be in the best interest of public safety." *Id.* Moreover, a rehabilitation plan that included widening of the bridge would impair the bridge's historic integrity, thus defeating the goal of historic preservation. *See* A.R. 238 at 25; *see also* A.R. 236 at III.3–4, IV.18.

### d. The Historic Truss Bridge Study

In October 1997, VTRANS commissioned the "Vermont Historic Metal Truss Bridge Study" to help state agencies and towns in their decisionmaking regarding historic truss bridges (the "Historic Truss Bridge Study"). *See* A.R. 239. The principal purpose of the study was to "establish a comprehensive preservation plan that w[ould] address which of Vermont's historic truss bridges c[ould] be preserved." A.R. 239 at 1. The "underlying premise" of the study was "that each bridge included in the study is historic and worthy of preservation." *Id.* The Pioneer Street Bridge was included in the Historic Truss Bridge Study.

The Historic Truss Bridge Study found that most of the historic bridges in Vermont did not meet modern standards for roadway width and load capacity. The study recommended that seventy bridges—Pioneer Street not among them—remain in use in the primary transportation system. It recommended thirty bridges, including Pioneer Street, for "adaptive or alternative use,"[6] such as bike, pedestrian, or snowmobile paths, "historic interpretation locations," or use as "false fascia." A.R. 239 at 26. Specifically, the study stated that the Pioneer Street Bridge "has reached the end of its useful life as a traffic-bearing structure because it is in poor condition and should be relocated for adaptive use ...." A.R. 239 at 41–42.

---

project." *Id.* Moreover, the study noted that while this alternative "would preserve the historic nature of the structure[,] ... the construction of a new bridge in close proximity to this bridge may detract from the aesthetic quality of the bridge." *Id.*

6. Importantly, the Historic Truss Bridge Study noted that "[c]onverting the structure to an adaptive use can reduce member stress

ranges and, therefore, extend the safe fatigue life of the structure.... For the oldest, and generally most historic structures in the State that have neared the end of their fatigue life, it may only be practical to remove the structures from vehicular loading by converting them to recreational use bridges." A.R. 239 at 62.

## 2. Procedural history of the Pioneer Street Bridge Project

Efforts to address the deficiencies of the Pioneer Street Bridge began in 1992, when VTRANS engaged Holden Engineering & Surveying to prepare the Holden Report and requested funds from the FHWA to cover a percentage of the preliminary engineering studies, with the express goal of rehabilitating the bridge. *See* A.R. 1. The FHWA authorized VTRANS to begin the preliminary procedures with regard to the bridge. *See.*A.R. 4.

On March 17, 1998, VTRANS' Historic Preservation Coordinator sent documentation (including an excerpt of the Pioneer Street Bridge Plan and a Memorandum of Agreement ("MOA") between the Historic Preservation Officer and the State Historic Preservation Officer) to the FHWA in compliance with § 106 of the National Historic Preservation Act of 1966 ("NHPA") and the regulations implementing that Act.[7] *See* A.R. 12. In the accompanying MOA, the Historic Preservation Officer made a finding of "adverse effect" under the NHPA, but provided for mitigation of that adverse effect by requiring placement of the bridge in VTRANS' adaptive use program and protection of potentially sensitive archeological areas near the site. *See* A.R. 17–18.

On March 30, 1998, the FHWA's Division Administrator, Frederick H. Downs ("Downs"), sent a letter to the Secretary of VTRANS explaining that federal funding would not be available for rehabilitation of the Pioneer Street Bridge. *See* A.R. 31. In that letter, Downs wrote that he was "aware that there ha[d] been a great deal of discussion on the relative merits of rehabilitating the existing bridge or replacing it with a new structure." *Id.* He also noted "that the Montpelier City Council

ha[d] voted in favor of replacing the bridge and that the Montpelier residents [had] recently voted in favor of an advisory referendum which called for rehabilitation of the bridge." *Id.* However, "[a]fter further exploring the project history and the purpose and need for replacement or rehabilitation, [he] determined that it would not be in the public interest to rehabilitate the existing structure." *Id.* He based this decision on: the fact that one of the primary reasons for the project was to provide truck access to the city's industrial area between Barre Street and the Winooski River, the conclusion of the Historic Truss Bridge Study that the bridge "did not need to be preserved but should be placed in [VTRANS'] Adaptive Use Program and made available for relocation for alternative transportation purposes," and the fact that the State Historic Preservation Officer concurred with this conclusion and the Section 106 MOA. A.R. 31–32.

On April 16, 1998, Downs forwarded the finding of adverse effect and an MOA concurred in by the FHWA, the Vermont State Historic Preservation Officer, VTRANS, and the City of Montpelier, outlining measures to preserve the bridge for alternative use in a new location and photographic documentation of the bridge in its existing location, to the Advisory Council on Historic Preservation ("ACHP"). *See* A.R. 33–42. That MOA was "accepted" by the ACHP on August 13, 1998, *see* A.R. 76, attached to a letter from a representative of the ACHP indicating that "[b]y carrying out the terms of the [MOA], FHWA will have fulfilled its responsibilities under Section 106 of the National Historic Preservation Act and the Council's regulations for this undertaking." A.R. 70.

7. Plaintiff has brought no claim in this case under NHPA; thus, there is no dispute as to whether the government defendants have complied with that statute.

In July of 1998, FHWA also received a fully executed "Programmatic Memorandum of Agreement for the Vermont Historic Bridge Program,"[8] attached to a letter in which the ACHP similarly stated that "[b]y carrying out the terms of the Agreement, FHWA will have fulfilled its responsibilities under Section 106 of the National Historic Preservation Act ...." A.R. 45.

On September 2, 1998, the Secretary of VTRANS wrote a letter in response to a citizen complaint arguing that the Pioneer Street Bridge should be rehabilitated. The letter explained that "given the City's stated purpose and need for the project, the FHWA would not finance a rehabilitation that did not include widening the bridge to 26 feet (the minimum for traffic volume under our revised State Standards)" and that widening the bridge "would not maintain the historic nature of the bridge." A.R. 78.

On September 29, 1998, VTRANS sent a letter recommending to the FHWA that the Pioneer Street Bridge Project be categorically excluded from environmental review pursuant to 23 C.F.R. § 771.117(d)(3), as the project consisted of bridge replacement and would "not involve substantial planning, resources, or expenditures; nor is it likely to induce significant alterations in land use, planned growth, development patterns, traffic volumes, or traffic patterns." A.R. 80. The letter further stated that "[n]o significant environmental impact is expected to result from construction or maintenance of this facility." *Id.* Attached

to the letter was a "Categorical Exclusion Environmental Analysis Sheet" ("CEEAS"), *see* A.R. 82–86, the project-specific MOA, *see* A.R. 87–92, a "Section 4(f) Programmatic Evaluation," A.R. 93–100, and preliminary project plans, *see* A.R. 101–06.

In the CEEAS, the "Project Purpose & Need" was described in the following way: "This structure, constructed in 1929, is badly deteriorated and is now critically deficient. The proposed project will involve replacement with a modern steel beam and concrete structure." A.R. 82. The CEEAS then considered, in checklist form, a variety of potential impacts stemming from the project. *See* A.R. 82–86.

On October 12, 1998 (before concurring in and thereby executing the categorical exclusion ("CE")), the Environmental Programs Manager of the FHWA, Kenneth Sikora ("Sikora"), sent a memo to Downs containing the supporting documentation for the "Programmatic Section 4(f) Determination,"[9] evaluating and rejecting four alternatives to replacement and relocation for alternative use of the Pioneer Street Bridge. *See* A.R. 107–10. The rejected alternatives were (1) to do nothing; (2) to rehabilitate the bridge without affecting its historic integrity; (3) to build a new one-way bridge on an adjacent alignment and rehabilitate the existing bridge for one-way traffic only; and (4) to build a new bridge at a different location and retain the existing bridge for alternative use only.

---

8. This agreement addressed the FHWA's treatment of all of Vermont's historic bridges, including the Pioneer Street Bridge—thus, it is broader than the project-specific MOA referenced above.

9. The nationwide "Programmatic Section 4(f)," discussed in more detail below, is a document that outlines the procedures to be

followed for projects affecting bridges which are on or eligible for inclusion on the National Register of Historic Places. It was designed to simplify and streamline compliance with Section 4(f) evaluations of historic bridges. *See* Historic Bridges; Programmatic Section 4(f) Evaluation and Approval, 48 Fed. Reg. 38,135-03 (August 22, 1983).

Sikora found that the first alternative (do nothing) would "not solve the problems identified for this project." A.R. 108.

This alternative would leave the bridge with a substandard load carrying capacity of 3 tons, substandard geometry on the southbound approach roadway, and a substandard clear width of 20 feet on the bridge.... Rerouting traffic to other city roads would not meet the needs of the community because this bridge is the primary access to a number of important commercial, industrial, and residential sites and districts. The structural problems with the bridge have reached a degree where they are irreversible, and routine maintenance cannot solve the problems. The continuing deterioration cannot be stopped. This alternative is not prudent because it will not meet the project need.

*Id.* He rejected the second alternative (rehabilitation without affecting the bridge's historic integrity) because "[a]s designed, Bridge No. 6 lacks sufficient geometric and structural capacity to carry current loads safely." *Id.* This alternative would "neither improve the bridge's geometry nor increase its structural capacity sufficiently to serve current loading requirements for commercial and industrial vehicles, as well as emergency equipment. The bridge would still suffer stress from some heavy industrial and commercial users, and ultimately its life would be shortened." *Id.* Sikora further noted that the "extensive alterations" needed to meet geometric and load requirements "would adversely affect the historic integrity of the bridge and would therefore not be an avoidance alternative." *Id.* Nor, Sikora found, would rehabilitation address the bridge's poor approach alignment. *See id.*

Sikora rejected the third avoidance alternative (new one-way bridge) because rehabilitation of the Pioneer Street Bridge would cost roughly 50% of the cost of a new bridge. Together, the cost of rehabilitation of Bridge No. 6 plus the cost of a new bridge would be 150% of the cost of constructing a new two-lane bridge. This would constitute a cost of extraordinary magnitude compared to the proposed project.

A.R. 108–09. Also, Sikora reasoned,

rehabilitation of Bridge No. 6 for one-way traffic would still not increase the bridge's structural capacity sufficiently to accommodate current loading requirements for the same reasons as the rehabilitation alternative, nor would it address the bridge's poor approach alignment. Moreover, construction of a second bridge along an adjacent alignment would further impair sight distance at the intersection of Pioneer Street and Barre Street ... [and] would cause severe hydraulics problems and jeopardize the structural integrity of the piers of the new bridge.

A.R. 109.

Finally, Sikora rejected the fourth alternative (building a new bridge on a new alignment and retaining Pioneer Street for alternative use) because it would

cause severe hydraulics problems and jeopardize the structural integrity of the piers of the new bridge. Locations for a new crossing are limited in this urban area and the costs of additional right-of-way and construction of new approach roadways would be considered to be of extraordinary magnitude compared to the proposed project.

*Id.* He also concluded that "the site [sic] distance from the new bridge would be impaired at the intersection of Pioneer Street and Barre Street, as well as at entrances to commercial sites along Pioneer Street." *Id.*

In the same document, Sikora also found that the project included all possible planning to minimize harm, including documentation and recording of the bridge and rehabilitation for adaptive use. *See* A.R. 109. Sikora concluded that the "project meets the applicability criteria of the Programmatic Section 4(f) for Historic Bridges," that "there are no feasible and prudent alternatives to the use of Bridge No. 6," that "[t]he measures to minimize harm are hereby assured to be implemented with the construction of the project," and that "[t]his memorandum will document that the Programmatic Section 4(f) evaluation applies to this project." A.R. 110.

On October 22, 1998, Sikora concurred in VTRANS' original determination that the project be categorically excluded from environmental review. *See* A.R. 81.

A series of communications between Plaintiff and the FHWA is also included in the administrative record. In the course of that dialogue, FPSB challenged the FHWA's CE determination on various grounds. The FHWA responded by clarifying its position and inviting further input, but advising the Plaintiff that "there is no formal appeal process for a CE determination": "our determination is administratively final; the only recourse available for overturning a NEPA determination is through the legal process, i.e., litigation through the court system." A.R. 148.

The FHWA conducted internal discussions regarding the issues raised by FPSB but on March 9, 2001, the government defendants decided to uphold their original CE determination. *See* A.R. 219. Attached to the document containing the decision that the CE remained valid upon re-evaluation (the "CE re-evaluation") was a memorandum addressing in detail the concerns of FPSB as expressed in their let-

ters to the FHWA. *See* A.R. 227–30. Specifically, the FHWA addressed FPSB's concerns regarding air quality, noise, water quality, historic and archeological resources, public participation, socioeconomic impact, aesthetic concerns, and safety. *See id.* The FHWA found that none of the issues raised by Plaintiff warranted reversal of the CE determination.

Among the issues raised by FPSB in one of its letters to Defendants was the fact that in three referendum votes in the City of Montpelier, a majority of the citizens voted for rehabilitation of the Pioneer Street Bridge. These were only advisory votes, however, and the City Council decided against rehabilitation in spite of them. Moreover, Defendants note that the ballot and the campaign flyers did not make clear all of the issues involved. *See* A.R. 130 (campaign flyer); A.R. 193 (sample ballot). For example, voters may not have been aware that VTRANS intended to rehabilitate and relocate the bridge for recreational use if possible within the City of Montpelier, or the fact that rehabilitation of the Pioneer Street Bridge to comply with structural and geometric requirements would impair the bridge's historic integrity.

## II. Legal Standards

Summary judgment should be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing agency action under the APA in general, "a district court must hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (West 2000); *see also Citizens to Pres. Overton*

*Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

■ Under the "arbitrary and capricious" standard, "administrative action is upheld if the agency has 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 982 (9th Cir.1985) (quoting *Baltimore Gas· & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)); *see also Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1574 (10th Cir.1994). "[T]his standard is exceedingly deferential ...." *Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 541 (11th Cir.1996). The court's role is to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Volpe,* 401 U.S. at 416, 91 S.Ct. 814; *see also Sierra Club v. United States Army Corps of Eng'rs,* 772 F.2d 1043, 1051 (2d Cir.1985) (agency action is arbitrary and capricious when it "relies on factors Congress did not want considered, or utterly fails to analyze an important aspect of the problem, or offers an explanation contrary to the evidence before it, or its explanation ... is so implausible that it cannot be ascribed to differing views or agency expertise"). Moreover, "an agency decision is entitled to some presumption of regularity," *Preston v. Heckler,* 734 F.2d 1359, 1372 (9th Cir. 1984), and the burden of proof is on the party challenging the agency's decision, *Park County Res. Council, Inc. v. USDA,* 817 F.2d 609, 621 (10th Cir.1987), *overruled on other grounds by Vill. of Los Ranchos de Albuquerque v. Marsh,* 956 F.2d 970, 973 (10th Cir.1992).

Under the APA, judicial review is generally based on a "review [of] the whole record or those parts of it cited by a party ...." 5 U.S.C.A. § 706(2). Thus, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam).

■ Further, when a federal agency interprets its own regulations, its interpretation is afforded special consideration. "[A]n agency's interpretation of its own regulations, including its procedural rules, is entitled to great deference." *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 738 (10th Cir.1993). A federal court should only reject the agency's interpretation when it is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." *Id.; see also Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) ("provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation") (internal quotation marks omitted).

■ Finally, the Court notes that an agency's decision to categorically exclude a proposed project from environmental review "is entitled to substantial deference." *City of New York v. ICC,* 4 F.3d 181, 186 (2d Cir.1993).

## III. Discussion

### A. The categorical exclusion ("CE") determination

■ Plaintiff's first challenges the decision by VTRANS and the FHWA to "categorically exclude" the Pioneer Street Bridge Project from environmental review. Plaintiff alleges that this determination

was "arbitrary and capricious and otherwise not in accordance with law." Mem. in Supp. of Pl.'s Mot. for Summ. J. at 2 (Paper 14) [hereafter, "Pl.'s Mem."]. It further contends that the documents submitted by VTRANS were "insufficient to support a CE determination," and that the FHWA

did not conduct a sufficient independent analysis, did not require documents to be submitted which are mandated by its own regulations, and did not follow its own or [the Council on Environmental Quality] regulations in regards to the presence of unusual circumstances relative to the project. FHWA did not make its own, independent, early, deter-

mination of the appropriate level of project review, nor did it conduct any independent study or analysis. The FHWA categorical exclusion was a rubber-stamp, post-hoc justification, of a decision made by VTRANS at the behest of the City of Montpelier.

Pl.'s Mem. at 2–3. Rather than finding a CE, FPSB contends that the FHWA should have prepared either an Environmental Impact Statement ("EIS") or an Environmental Assessment ("EA") for the proposed project.[10]

NEPA requires a federal agency undertaking a "major Federal action[ ][11] significantly[12] affecting the quality of the human

---

10. An EIS is a "detailed statement" on:

    (i) the environmental impact of the proposed action,

    (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

    (iii) alternatives to the proposed action,

    (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

    (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C.A. § 4332(2)(C). Before preparing an EIS, "the responsible official shall consult with and obtain comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.*

An EA is "a concise public document ... that serves to:

    (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

    (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary."

40 C.F.R. § 1508.9(a) (2001). An EA should "include brief discussions of the need for the proposal, of alternatives, ... of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

11. "The phrase 'Federal action' also includes those projects undertaken or performed essentially by the states but funded in whole or in part by the federal government." *Citizen Advocates for Responsible Expansion, Inc. v. Dole,* 770 F.2d 423, 431 n. 9 (5th Cir.1985) (citing 42 U.S.C. § 4332(D)).

12. The CEQ regulations provide that the term "'[s]ignificantly' as used in NEPA requires considerations of both context and intensity ...." 40 C.F.R. § 1508.27 (2001). The context prong requires that

the significance of an action ... be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

40 C.F.R. § 1508.27(a). "Intensity" refers to "the severity of impact." 40 C.F.R. § 1508.27(b). The regulations provide, in relevant part, that the following factors should be considered in evaluating intensity:

    (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

    ...

    (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

environment" to prepare an EIS. 42 U.S.C.A. § 4332(2)(C). Under federal regulations promulgated by the Council on Environmental Quality ("CEQ"), however, the responsible agency may instead first prepare an EA in order to determine whether an EIS is necessary. *See West v. Sec'y of the DOT*, 206 F.3d 920, 927 (9th Cir.2000) (quoting 40 C.F.R. § 1508.9(a)(1) (1997)). If the EA reveals that the project will not have a significant effect on any aspect of the environment, the agency issues a "Finding of No Significant Impact," 40 C.F.R. § 1508.13 (2001), and no EIS is required. *See West*, 206 F.3d at 927.

In some cases, moreover, neither an EA nor an EIS is required. *See id.* (citing 23 C.F.R. § 771.115). The CEQ's NEPA regulations authorize an agency to use a "Categorical Exclusion" for the "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations ...." 40 C.F.R. § 1508.4 (2001); *see also* 40 C.F.R. § 1500.4(p) (2001). "Neither an EIS nor an EA is required for actions categorically excluded from NEPA review." *West*, 206 F.3d at 927.

Pursuant to the CEQ regulations, each agency is responsible for developing criteria to determine the appropriate level of environmental review for different types of actions. *See* 40 C.F.R. § 1507.3(b)(2) (2001). The FHWA has thus created three classes of review—EIS, EA, and CE—each requiring different levels of documentation. *See* 23 C.F.R. § 771.115 (2001). The FHWA defines CEs as "actions which meet the definition contained in 40 C.F.R. 1508.4, and, based on past experience with similar actions, do not involve significant environmental impacts." 23 C.F.R. § 771.117(a) (2001). Specifically, these are actions which:

> do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts.

*Id.* Importantly, the FHWA regulations governing CEs also provide that "[a]ny action which normally would be classified as a CE but could involve unusual circumstances will require the Administration, in cooperation with the applicant, to conduct appropriate environmental studies to determine if the CE classification is proper." 23 C.F.R. § 771.117(b). Such unusual circumstances include:

> (1) Significant environmental impacts;
>
> (2) Substantial controversy on environmental grounds;
>
> (3) Significant impact on properties protected by section 4(f) of the DOT Act or section 106 of the National Historic Preservation Act; or
>
> (4) Inconsistencies with any Federal, State, or local law, requirement or administrative determination relating to the environmental aspects of the action.

*Id.*

The FHWA regulations set forth two types of categorical exclusions. *See* 23

---

... 

(8) The degree to which the action may adversely affect ... sites ... listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

*Id.*

C.F.R. § 771.117(c) and (d). First, the regulations provide for categorical exclusion of twenty listed actions that meet the CE criteria and generally do not require further NEPA documentation. *See* 23 C.F.R. § 771.117(c). It is undisputed that the Pioneer Street Bridge Project does not come within any of those twenty listed actions.

The second type of CE for which the regulations provide is called a "documented categorical exclusion" ("DCE"). A DCE is available for actions that meet the general definition of a CE set forth in 40 C.F.R. § 1508.4 and 23 C.F.R. § 771.117(a) and for which the applicant submits documentation demonstrating compliance with the categorical exclusion criteria. *See* 23 C.F.R. § 771.117(d). Section 771.117(d) provides a nonexclusive list of examples for which a DCE may be appropriate, including "[b]ridge rehabilitation, reconstruction or replacement." 23 C.F.R. § 771.117(d)(3). Accordingly, FHWA executed a DCE for the replacement of the Pioneer Street Bridge.

█ FPSB alleges that the FHWA's CE determination was invalid for several reasons. First, it claims that the FHWA's finding that the project "is [not] likely to induce significant alterations in . . . development patterns," A.R. 80, was not supported by the administrative record. *See* Pl.'s Mem. at 9–12. In support of this contention, FPSB argues that "[s]prinkled through the record are indications that development was one of Montpelier's driving considerations." *Id.* at 10 (citing A.R. 178 ("Concern with rehab has been the inability of the truss bridge to handle volume of traffic, trucks and potential future development."); A.R. 169 ("Improvement to truck access brought about by bridge replacement may assist in the development of the [Zorzi property] for [industrial, manufacturing, and commercial] uses.")).

While it may be true that Montpelier has sought to develop the area near the Pioneer Street Bridge, this fact alone does not establish that the project will have a significant impact on development patterns. The development discussed in the record may happen without regard to the ultimate fate of the Pioneer Street Bridge; any impact that the bridge project may have on development is purely speculative. Moreover, the possibility that there will be some impact on development patterns is not inconsistent with the FHWA's findings; the issue is whether such impacts will be *significant.* The Court finds that the FHWA's conclusion that the project would not significantly alter development patterns was not arbitrary or capricious, and should be upheld.

█ Second, FPSB alleges that the finding that the project was not likely to significantly affect traffic volumes and patterns was similarly unsupported by the administrative record. *See id.* at 12. Specifically, FPSB relies on a note in the record stating that "[b]ridge replacement will likely draw some truck traffic from the downtown area and eastbound Barre St.," A.R. 169, and the letter in which Downs stated that "[o]ne of the primary reasons for the project is to provide truck access to the city's industrial area between Barre St. and the Winooski River," A.R. 31. While these citations to the record demonstrate that the government defendants had traffic issues in mind while making their decision to replace the bridge, the record also supports their conclusion that the project's impact on traffic patterns and volume will not be significant.

At the outset, the Court agrees with Defendants that the appropriate comparison for analysis of traffic patterns is between the proposed replacement bridge and the bridge *"before* its deficiencies forced authorities to restrict traffic and,

more recently, close it to traffic altogether." Supp. Mem. of Law at 6 n. 9 (Paper 32) (citing *Sierra Club v. Hassell*, 636 F.2d 1095 (5th Cir.1981)). With this in mind, the Court finds that there is support in the record for the conclusion that the bridge replacement project will not have a significant impact on traffic patterns, as the posted speed limit over the bridge will remain the same as it was before the bridge was shut down, *see* A.R. 211, 215, and the traffic volume over the bridge is only likely to increase at a modest rate, based on normal traffic projections, *see* A.R. 238 at 11, A.R. 238 at App. J. The fact that traffic will no longer need to be rerouted over other bridges with access to Barre Street is of little consequence, since the current rerouting is simply a product of the bridge having been shut down. Thus, the government defendants' finding of no significant impact on traffic volumes and patterns was not arbitrary and capricious and should be upheld.

■ Third, FPSB criticizes the FHWA's assertion that it provided opportunities for public participation in the project decision-making. FPSB asserts that by failing to meaningfully provide for public participation, the FHWA violated regulations promulgated under the "Federal Aid Highway Program" and "the NEPA goal of both informing the public and receiving the wisdom of meaningful public comment." Pl.'s Mem. at 12–14. However, as Defendants correctly assert, there is no requirement that public hearings be held when a project has been classified as a CE. *See* Defs.' Mem. at 33 (citing *Pub. Interest Research Group v. Fed. Hwy. Admin.*, 884

F.Supp. 876 (D.N.J.), *aff'd*, 65 F.3d 163 (3d Cir.1995)). In any event, according to the record, in addition to two public hearings conduct by VTRANS, more than eighteen "public discussions" were held about the project. *See* A.R. 228. Thus, even if public participation was required for a CE determination, the Court finds that the government defendants provided sufficiently for such participation, and FPSB's argument to the contrary does not undermine the validity of their CE determination.

Fourth, FPSB alleges that the government defendants failed to address environmental justice issues in the CE determination. *See* Pl.'s Mem. at 14. In fact, the record belies this assertion. After FPSB raised an environmental justice issue in one of its letters to the FHWA, *see* A.R. 198, 202–03, Sikora requested that VTRANS perform an analysis of such issues, *see* A.R. 214, and that analysis was attached to the CE re-evaluation, *see* A.R. 229. In that attachment, the government defendants observed that there were very few residences near the bridge area and that the properties did not constitute a "low-income neighborhood," such that environmental justice issues would be implicated. *See id.* Thus, the Court finds that the government defendants adequately addressed environmental justice issues to the extent that they were required to in making the CE determination.

■ FPSB further alleges that the CE determination was invalid because there were "unusual" or "extraordinary"[13] circumstances that called for the preparation

---

**13.** The term "extraordinary" (rather than "unusual") modifies "circumstances" in the CEQ regulation, 40 C.F.R. § 1508.4 (2001), pursuant to which the FHWA regulations governing "unusual circumstances" were promulgated. *See id.* ("Any procedures under this section shall provide for *extraordinary* circumstances in which a normally excluded action may have a significant environmental effect.") (emphasis added). The Court thus assumes that the FHWA's use of the word "unusual" was meant to be synonymous, in this context, with "extraordinary" as used in the CEQ regulation.

of environmental studies. The unusual circumstances that FPSB allege apply here are substantial controversy on environmental grounds and significant impact on a section 4(f) property.[14] *See* Pl.'s Mem. at 14–18.

In support of its claim that there was substantial controversy, FPSB relies primarily on the three advisory city-wide voter referenda, whose results indicated that a majority of the voting population was in favor of the rehabilitation of the Pioneer Street Bridge.

" 'Opposition and a high degree of controversy, however, are not synonymous.' " *Fund for Animals v. Babbitt,* 2 F.Supp.2d 570, 577 (D.Vt.1997) (quoting *Town of Orangetown v. Gorsuch,* 718 F.2d 29, 39 (2d Cir.1983)), *aff'd,* 152 F.3d 918 (2d Cir. 1998). Moreover, the misleading nature of the wording of the ballots and campaign materials for those referenda cut against a conclusion that there was substantial controversy on environmental grounds in this case sufficient to warrant invalidation of the CE determination. The Court finds that the government defendants' failure to find unusual circumstances stemming from such controversy was not arbitrary or capricious, and should be upheld.

As to its claim that the project entails a significant impact on 4(f) property, constituting an unusual circumstance under the CE regulations, FPSB asserts that "[t]he determination that the Pioneer Street truss bridge in [sic] National Historic Register eligible means it is 'significant', and that it 'has historic significance.' " Pl.'s Mem. at 17 (citation omitted). However, the question is not whether the *bridge* is significant (or has historic significance), but whether the *impact* is significant. The Court agrees with Defendants that a mere finding of "adverse effect" on a 4(f) property[15] (especially where, as here, the agency has provided for mitigation of that adverse effect) is insufficient to support the conclusion that the project will "significantly impact" a 4(f) property. *See* Defs.' Mem at 30 (citing *City of New York v. ICC,* 4 F.3d at 186; *Ala. Ctr. for the Env't v. United States Forest Serv.,* 189 F.3d 851, 860 (9th Cir.1999)). The FHWA's determination that there was no significant impact is entitled to substantial deference and is supported by the mitigation measures undertaken to preserve the bridge. *See City of New York v. ICC,* 4 F.3d 181. The Court therefore finds that this decision as well was not arbitrary or capricious.

Finally, FPSB alleges that the CE determination was invalid because the FHWA failed to make its own, early determination of a CE or of the project's purpose and need, instead relying on the City of Montpelier's stated project purpose and need, which necessarily excluded any of the proposed alternatives to replacement of the existing bridge. *See id.* at 18–21 ("Acceptance of a purpose and need statement produced by a party neither the agency nor the applicant, and which itself dictates a foregone conclusion as to the project to be undertaken, violates the spirit of NEPA and is arbitrary, capricious, and otherwise not in accordance with law."). FPSB's argument on this point is poorly articulated and is unsupported by

---

14. The parties do not dispute that the Pioneer Street Bridge qualifies as "4(f) property." Thus, the only real issue is whether the replacement and relocation of the bridge constitutes a "significant impact" under the regulations.

15. There is no dispute that the FHWA found that "[t]he removal, relocation and reuse of the existing bridge is an adverse impact under Section 106" of the NHPA. A.R. 230; *see also* A.R. 33.

the governing regulations. Moreover, while possibly relevant to the agency's 4(f) determination, the project's stated purpose and need has little bearing on the CE determination. Hence, the Court finds this argument to be without merit. The CE determination made by the government defendants in this case was not arbitrary or capricious and must be upheld.

### B. The FHWA's "4(f)" determination

■ FPSB's second challenge is to the FHWA's "Section 4(f)" determination regarding the Pioneer Street Bridge Project. Pursuant to 49 U.S.C. § 303(c),[16] "[t]he Secretary may approve a transportation ... project ... requiring the use of ... land of an historic site ... only if—

> (1) there is no prudent and feasible alternative to using that land; and
>
> (2) the ... project includes all possible planning to minimize harm to the ... historic site resulting from the use."

49 U.S.C.A. § 303(c) (West 2000).[17] FHWA found that these requirements were satisfied (i.e., that there were no prudent and feasible alternatives and that the project included all possible planning to minimize harm to the site) and therefore approved the project. There is no dispute in this case that § 4(f) is applicable to the Pioneer Street Bridge. The only dispute

relates to whether the FHWA fulfilled the substantive requirements of that section.

FPSB alleges a number of deficiencies in the FHWA's 4(f) determination of no prudent and feasible alternatives to use of the bridge. First, FPSB again criticizes the FHWA's repeated reliance on Montpelier's stated project purpose and need to dismiss stated alternatives as either not prudent or neither feasible nor prudent. "[T]o allow the FHWA to reject as imprudent alternatives which do not meet a stated objective of removal of the historic structure at issue simply because they do not meet the project purpose, twists the historic preservation goals of Congress to [sic] a semantic shell game. Any park or historic site could be eliminated if the state [sic] project goal was the elimination of that park or site." Pl.'s Mem. at 27.

Although the language of the 4(f) documentation may appear to suggest that FHWA was relying solely on the city's stated purpose and need for the project in rejecting each avoidance alternative, the FHWA clearly relied on other factors as well. The Court disagrees that this criticism warrants a finding that the government defendants' 4(f) studies were legally inadequate under the appropriate standard of review. The Court's task in reviewing agency action is not to split hairs about the language of the supporting documents for each of the agency's determinations, but rather to examine the record to see if the

---

16. Determinations under this provision are labeled "4(f)" matters after their prior codification number because, according to FHWA regulations, "it would create needless confusion to do otherwise." 23 C.F.R. § 771.107(e) n. 1 (2001).

17. The term "feasibility," as used in this section, "focuses upon what 'sound engineering' makes possible." *Wade v. Lewis*, 561 F.Supp. 913, 949 (N.D.Ill.1983) (quoting *Volpe*, 401 U.S. at 411, 91 S.Ct. 814), *appeal dismissed by Wade v. Baise*, 767 F.2d 925 (7th Cir.1985). "For the exception to th[is] statute[] to apply,

'the Secretary must find that as a matter of sound engineering' " that the alternatives to the proposed project would not be feasible. *Id.* (quoting *Volpe*, 401 U.S. at 411, 91 S.Ct. 814).

" 'Prudence,' as used in th[is] section[], connotes more than 'a wide-ranging balance of competing interests.' An alternative is 'prudent' if it does not present 'unique problems.' 'Only the most unusual situations are exempted.' " *Id.* (quoting *Volpe*, 401 U.S. at 411, 416, 91 S.Ct. 814).

agency's ultimate conclusion was supported by the record and was not "arbitrary, capricious, or otherwise not in accordance with law." As set forth in detail below, there is support in the record for the FHWA's rejection of each of the Programmatic 4(f) avoidance alternatives. Therefore, the Court disagrees with FPSB's criticism that the FHWA relied solely on Montpelier's stated project purpose and need in making the 4(f) determination.

FPSB next argues that the FHWA failed to meaningfully evaluate the feasibility or prudence of any of the stated alternatives to use of the Pioneer Street Bridge even under procedures promulgated by the FHWA itself—namely, the "Historic Bridges; Programmatic Section 4(f) Evaluation and Approval" [hereafter, "Programmatic 4(f)"], 48 Fed.Reg. 38,135 (August 22, 1983) (Paper 20, Ex. B). The FHWA developed the Programmatic 4(f) to "simplify and streamline compliance with the Section 4(f) requirements [for the use of historic bridges] and shorten the required processing time." *Id.* at 38,137. The Programmatic 4(f) states that "[b]efore this programmatic Section 4(f) approval can be used for a particular highway improvement, an analysis of all the studies necessary to document the fact that there are no feasible and prudent alternatives to the use of the historic bridge will have to be completed." *Id.* The Programmatic 4(f) requires that three alternatives—(1) do nothing; (2) build a new structure at a different location without affecting the historic integrity of the old bridge; and (3) rehabilitate the historic bridge without affecting its historic integrity—be evaluated and that the findings regarding the feasibility and prudence of each option be "supported by the circumstances, studies, and consultations on the project." *Id.* at 38,139.

FPSB states that "[a]lthough there are four alternatives listed in the 4(f) document, no actual substantive alternative was in any [sic] evaluated." Pl.'s Mem. at 31. This is clearly untrue. Moreover, while the 4(f) document itself may not have *fully* evaluated each alternative, there can be little question that the record contains rather extensive evaluations of the alternatives to replacement of the bridge and relocation for adaptive reuse (embodied in at least two engineering studies specific to the Pioneer Street Bridge). The Court finds that there is sufficient documentation in the record to support the FHWA's rejection of all three alternatives set forth in the Programmatic 4(f).

First, there can be no question that the FHWA properly rejected "do nothing" avoidance alternative. In order to reject the "do nothing" alternative under the Programmatic 4(f), the agency must study this alternative and find, for the following reasons, that this alternative is not feasible and prudent:

a. Maintenance—The do nothing alternative does not correct the situation that causes the bridge to be considered structurally deficient or deteriorated. These deficiencies can lead to sudden collapse and potential injury or loss of life. Normal maintenance is not considered adequate to cope with the situation.

b. Safety—The do nothing alternative does not correct the situation that causes the bridge to be considered deficient. Because of these deficiencies, the bridge poses serious and unacceptable safety hazards to the traveling public or places intolerable restriction on transport and travel.

48 Fed.Reg. 38,135, 38,140.

The FHWA properly rejected the "do nothing" alternative because it "does not correct the situation that causes the bridge to be considered structurally deficient" and

"[n]ormal maintenance is not considered adequate to cope with the situation." *Id.* Moreover, "[b]ecause of [its] deficiencies, the bridge ... places intolerable restriction on transport and travel," *id. See* A.R. 237 at 10–15 (describing the bridge's structural deficiencies); A.R. 237 at 50 ("The condition of the existing floor system (bridge deck, stringers, and floorbeams) warranted total replacement."); A.R. 237 at 23 (recommending extensive corrective action); A.R. 238 at 1 ("The structure, in general, is in poor condition."); *see also* A.R. 131 (showing sufficiency rating of 2 out of possible score of 100 for the Pioneer Street Bridge based on an inspection done in May 2000). The bridge's status as too structurally deficient to accommodate any traffic at all certainly makes this alternative imprudent. The FHWA's rejection of this alternative must be upheld.

The record also supports the FHWA's rejection of avoidance alternative (2), building a new bridge on a new location without using the old bridge, as not feasible or prudent. Under the Programmatic 4(f), in order to properly reject alternative (2), the record must show one of the following: (a) the present bridge has already been located at the only feasible and prudent site; (b) building a new bridge away from the present site would result in "social, economic, or environmental impact of extraordinary magnitude"; (c) "[w]here difficulty associated with the new location is less extreme than [in reason (b)], ... cost and engineering difficulties reach extraordinary magnitude"; and (d) "[i]t is not feasible and prudent to preserve the existing bridge ...." 48 Fed.Reg. 38,135, 38,140. The FHWA considered this alternative in two different ways: (1) building a new one-way bridge and rehabilitating the existing bridge for one-way traffic or (2) building a new bridge at a different location and retaining the Pioneer Street

Bridge in its current location for alternative use.

The Court concludes that the record sufficiently supports a finding that either of these alternatives would involve cost and engineering difficulties of extraordinary magnitude. The Pioneer Street Bridge Plan concluded that

> [a]lignment options for a new vehicular crossing are restricted in this urban area, specifically by the dam upstream and the alignment of U.S. Route 2 and other roads on each side of the river. The cost of acquiring the right-of-way for new approaches could add a significant amount to the overall cost of the project.

A.R. 238 at 25. Furthermore, the Vermont Historic Bridge Survey notes that "[p]reservation planning does not end once the total bypass option is selected: the maintenance and use of the old span must be considered. It must be inspected regularly in order to discern and arrest deterioration.... [E]ven if the old bridge must be closed off entirely, periodic inspection and maintenance must be provided." A.R. 236 at IV.20.

Moreover, concerns about hydraulics, safety, and other engineering problems arising from alternative (2) are present throughout the record. The Pioneer Street Bridge Study informs that "[t]he water surface profile at the bridge site indicates that the 50-year flood event passes underneath the bottom chord of the bridge," with one foot to spare. *See* A.R. 238 at 10. This hydraulic capacity meets current design standards. *See id.* However, the Historic Truss Bridge Study noted that

> [i]f a new bridge is proposed next to an existing truss bridge, the hydraulic interaction caused by the combined substructures must be considered. An undesirable scenario can exist when the

distance between the two structures is small. Changes to the stream flow characteristics, such as the development of swirling currents know as 'eddies,' can increase the potential for scour of the downstream structure.

A.R. 239 at 61; *see also* A.R. 238 at 10 ("The construction of a new structure within the immediate vicinity of the truss bridge ... should be carefully designed and evaluated to ensure that the hydraulic standard for bridges continues to be met. During design of new or modified structures, consideration shall also be given to the effect the bridge may have on surrounding property during a 100–year flood event."); A.R. 236 at IV.20 (warning that, generally, when implementing the alternative of bypassing the historic bridge with a new span, "care must be observed during construction to avoid damage to the older span, such as ... altering the stream's flow characteristics in a way that would undermine the old abutments"); *id.* (cautioning that the partial bypass option, where the historic bridge would be used for one-way traffic, "would result in a short stretch of divided road at the crossing, a major safety consideration"). The Holden Report indicated that a replacement bridge could be designed to withstand a 100–year hydraulic event. *See* A.R. 237 at 36. Furthermore, and significantly, there is a dam between 600 and 800 feet upstream from the Pioneer Street bridge which shows signs of deterioration, *see* A.R. 238 at 6; A.R. 237 at 2, which could have an impact on the potential for flooding, further bolstering the government defendants' concerns with hydraulics problems.

Even if, as Plaintiff contends, the record does not support the FHWA's conclusion that construction of a second bridge along an adjacent alignment "would cause severe hydraulics problems and jeopardize the structural integrity of the piers of both new and old bridges," A.R. 98–99, the combination of the increased long-term costs of maintaining the old bridge, the cost of acquiring rights-of-way for the new bridge, and the potential hydraulics problems caused by the interaction of the two bridges support the government defendants' rejection of alternative (2) as not feasible or prudent. In any event, the Court finds that this determination was not arbitrary or capricious, and therefore, it should be upheld.

In order to find that alternative (3) (rehabilitation without affecting historic integrity) is not feasible or prudent, the record must show that either: (a) the bridge is "so structurally deficient that it cannot be rehabilitated to meet minimum acceptable load requirements without affecting the historical integrity of the bridge"; or (b) the bridge is "seriously deficient geometrically and cannot be widened to meet the minimum required capacity of the highway system on which it is located without affecting the historic integrity of the bridge." 48 Fed.Reg. 38,135, 38,140. Notably, "[f]lexibility in the application of ... geometric standards ... should be exercised ... during the analysis of this alternative." *Id.*

The government defendants properly rejected this alternative, as the record clearly supports the finding that the bridge is so structurally and/or geometrically deficient that it cannot be rehabilitated without compromising its historic integrity. First, the Holden Report noted that "[b]ridge roadway width equal to twenty (20) feet (2 lanes, 2 way traffic) with Average Daily Traffic (ADT) greater than five-thousand (5000) is considered a 'basically intolerable condition requiring high priority of replacement'." A.R. 237 at 15. Second, the Pioneer Street Bridge Study informs us that, according to "State

Standards," the recommended clear roadway width for the bridge would be twenty-eight feet (as opposed to its current width of twenty feet) and the minimum roadway width is twenty-six feet. *See* A.R. 238 at 12. While the Study recognized that "historic bridges should be considered for design exceptions, and for rehabilitation rather than replacement...., the traffic volume, truck traffic and functional class of the roadway indicate that a design exception for width would not be in the best interest of public safety." A.R. 238 at 12. Furthermore, the record is replete with evidence that widening the bridge would greatly compromise (if not destroy) its historic integrity. *See, e.g.,* A.R. 238 at 25; A.R. 236 at III.3–4, IV.18. Thus, the government defendants' determination with regard to rejection of this alternative should also be upheld.

FPSB argues that the conclusions regarding the lack of feasibility of the avoidance alternatives in the 4(f) document are "[b]elied by the [o]nly [e]ngineering [i]nformation" in the record. Pl.'s Mem. at 33. The Court disagrees. As it has set forth in detail above, there is evidence in the record supporting the rejection of each of the avoidance alternatives in the Programmatic 4(f). Even accepting as true Plaintiff's contention that evidence supporting the feasibility of each of the alternatives is present in the record as well, the Court is persuaded that the government defendants' conclusions were "based on a consideration of the relevant factors," and that there has not "been a clear error of judgment." *Volpe,* 401 U.S. at 416, 91 S.Ct. 814. In order to find that the agencies' actions were not arbitrary and capricious, the Court must do more than simply find that the record *could have supported* a different decision. Rather, under the "arbitrary and capricious" standard, the Court must uphold the administrative action "if the agency has considered the rele-

vant factors and articulated a rational connection between the facts found and the choice made." *Friends of Endangered Species,* 760 F.2d at 982 (internal quotation marks omitted). The agencies here have successfully done this, and the Court must uphold their determinations.

■ FPSB also argues that the FHWA's conclusion that all possible planning was undertaken to minimize harm was erroneous because the bike path for which the bridge is allegedly to be used is only "a matter of wishful public discussion at this time." Pl.'s Mem. at 41–42. This argument misses the mark. While it is uncertain whether the bike path will be implemented, Defendants have provided for the possibility that it might not. The MOA states that

> [i]f, due to factors beyond the control of either FHWA or [VTRANS], adaptive use of Bridge No. 6 on the Montpelier East Bike Path is not feasible, [VTRANS] will partially disassemble the bridge and store it at an appropriate site until a new location can be found. [VTRANS] hereby commits to using its best efforts to secure an appropriate location, preferably in Montpelier, and will fund the costs for moving the bridge to its new location and for rehabilitation as part of the adaptive use program.

A.R. 88. Moreover, the FHWA provided that the Pioneer Street Bridge "will be documented and recorded in accordance with the Adaptive Use Program Manual prior to initiation of construction." A.R. 109. Finally, and perhaps most importantly, the Historic Truss Bridge Study stated that

> [c]onverting the structure to an adaptive use can reduce member stress ranges and, therefore, extend the safe fatigue life of the structure. Reinforcement or replacement of members can also im-

prove a structure's fatigue characteristics. For the oldest, and generally most historic structures in the State that have neared the end of their fatigue life, it may only be practical to remove the structures from vehicular loading by converting them to recreational use bridges.

A.R. 239 at 62. Therefore, it is likely that preservation of this historic structure is in fact *better* facilitated by removing the bridge than it is by leaving it in place. The government defendants' determination that they have undertaken all possible planning to minimize harm was not arbitrary and capricious and must be upheld.

Finally, FPSB challenges (in very brief form) the FHWA's failure to consider that the project will impact the railroad right-of-way owned by the state of Vermont which the Bike Path Committee has hoped to convert into the Montpelier East Bike Path. *See* Pl.'s Mem. at 42. "If the railroad right of way is to be considered a bike path for purposes of the minimization of harm requirement of the 4(f) determination, then it should also be considered a 'park land' for purposes of 4(f) evaluation." *Id.* This argument is meritless. There is no reason in law or logic why a right-of-way that has only been considered as a potential site for a bike path should be treated as "park land" under the 4(f) analysis, and Plaintiff has cited no case which would convince this Court to conclude otherwise. Thus, the Court holds that the government defendants' determinations involved in the 4(f) analysis were not arbitrary and capricious, and must be upheld.

## IV. Conclusion

Wherefore, the Court **DENIES** Plaintiff's motion for summary judgment (Paper 13) and **GRANTS** Defendants' cross-motion for summary judgment (Paper 19).

Plaintiff's complaint is **DISMISSED.** Case **CLOSED.**